42

635 A.2d 1062

COMMONWEALTH of Pennsylvania

v.

Joel R. DAVIS.

In re Petition to Intervene by WJAC, INC.

Superior Court of Pennsylvania.

Argued Sept. 1, 1993.

Filed Dec. 20, 1993.

44

Michael L. Stibich, Johnstown, for appellant.

Before ROWLEY, President Judge, and WIEAND and CIRILLO, JJ.

CIRILLO, Judge:

WJAC, Incorporated (WJAC) appeals from an order entered in the Court of Common Pleas of Jefferson County prohibiting the broadcasting and/or photographing of all Pennsylvania criminal judicial proceedings and maintaining possession of WJAC's confiscated video tape. After an extensive review of the record, rules of this Commonwealth, case law and applicable constitutional provisions, we affirm the trial court's order.

The underlying facts of this case are not in dispute. Radio personality Joel R. Davis (defendant) was tried for criminal homicide, *inter alia*, before a jury. Due to the high level of community interest in the case, a jury was impaneled after five and one-half days and 103 voir dire examinations. Thereafter, the jurors were sequestered.[1]

During the second day of trial, and at the request of both the District Attorney and the defendant's attorney, the proceedings were moved from the courthouse to the alleged crime scene, the victim's residence. *See* Pa.R.Crim.P. 1112.[2] The proceedings were moved to enable the jury to receive the

1. Pa.R.Crim.P. 1111(a) provides that "[t]he trial judge may, in his discretion, order sequestration of trial jurors in the interests of justice." *See also* Pa.R.Crim.P. 326 (special orders governing widely publicized or sensational cases).

2. "The trial judge may in his discretion order a view by the jury." Pa.R.Crim.P. 1112.

investigating officer's testimony as to what he found at the crime scene.

Prior to departing to the crime scene, certain members of the print and radio broadcast media inquired as to whether they would be permitted to take pictures during the jury viewing. Although no formal order was issued, the record indicates that the Honorable Edwin L. Snyder directed from the bench that no pictures would be permitted of the jury, the defendant, or court personnel.[3]

On behalf of WJAC, freelance photographer David Setree went to the crime scene to videotape the proceedings. Shortly after he arrived at the scene, both the Clerk of Courts and a member of the print media informed Mr. Setree of Judge Snyder's order. Despite this information, Mr. Setree continued to film the events.[4] He filmed the jurors as they departed from their vehicles and as they received instructions from Judge Snyder. After being apprised of Mr. Setree's conduct, Judge Snyder directed that the videotape be confiscated.

Judge Snyder granted WJAC's petition to intervene, which challenged the directive and subsequent seizure of the videotape.[5] After a hearing, Judge Snyder issued an order affirming the propriety of the directive and maintaining possession of the tape. Four months later, Judge Snyder granted WJAC's petition for leave to appeal *nunc pro tunc*.[6] On appeal, WJAC raises two questions for our consideration:

3. The record shows that no representative of WJAC was present at the issuance of Judge Snyder's directive.

4. In fact, the record shows that Mr. Setree telephoned a superior at WJAC's newsroom and told him of the restriction before he recommenced filming. Whether Mr. Setree resumed filming at the direction of his superior, or on his own accord, is not evidenced in the record and is not at issue in this appeal.

5. The filing of a motion to intervene in a criminal case by the news media has long been recognized by this Commonwealth as an appropriate means of raising assertions of public rights of access to information regarding criminal case proceedings. *Capital Cities Media, Inc. v. Toole*, 506 Pa. 12, 22–23, 483 A.2d 1339, 1344 (1984).

6. The Commonwealth, via District Attorney Mark A. Wallisch, filed a stipulation consenting to WJAC's petition. However, neither the Commonwealth nor the defendant of the underlying case submitted briefs to

(1) Whether the photography of criminal judicial proceedings is prohibited in Pennsylvania no matter where the proceedings are held?

(2) Whether the order of the trial court prohibiting the photography of criminal judicial proceedings held outside the courtroom and its environs and the enforcement of that order violates WJAC's First Amendment rights of newsgathering and communication?

## *I. AMBIT OF RULE 328*

Rule 328 of the Pennsylvania Rules of Criminal Procedure is the focal point of this appeal. In pertinent part, Rule 328 provides:

The taking of photographs in the courtroom or its environs or radio or television broadcasting from the *courtroom or its environs* during the progress of or in connection with any judicial proceedings ... is prohibited. The environs of the courtroom is defined as the area immediately surrounding the entrances and exits to the courtroom.[7]

(emphasis added).

 WJAC contends that Judge Snyder's directive and confiscation of its videotape exceeded the scope of Rule 328 and, therefore, interfered with its First Amendment right of newsgathering. Specifically, WJAC asserts that the jury viewing at the alleged crime scene is not covered by Rule 328 in that the viewing did not take place within the "courtroom or its environs." We disagree. As Judge Snyder aptly stated in his opinion, "if photography of judicial proceedings in criminal cases is prohibited in the courtroom and its environs, then likewise photography of such proceedings should not be permitted wherever they must be held."

In support of its contention that the facts of this case are not covered by Rule 328, WJAC reasons that because Rule

this court pursuant to this appeal and did not participate in oral argument.

7. The official Comment to Rule 328 provides that Rule 328 is not to be interpreted as precluding the use of recording devices for the preservation of testimony as permitted by the Rules.

1112 permits jury viewings, the Pennsylvania Supreme Court would have specifically included these jury viewings in Rule 328 had they so intended. We disagree, however, and find that Judge Snyder's order was in accordance with Rule 328.

What is considered a "court" in the legal sense is a question of law that may have practical importance where, as in this case, the applicability of a statute or rule referring to a court or to a proceeding before a court is at issue. The common law defined court as a *place* where justice is judicially administered. 20 Am.Jur.2d *Courts* § 1 (1965). The modern conception of a court, however, refers more to a governmental institution rather than to a place. *Id.* "More than the place where judicial functions are performed, a court is part of the government consisting of one person or several persons called upon and authorized to administer justice." 20 Am.Jur.2d *Courts* § 36 (1965).

The United States Supreme Court has stated that "the courtroom in Anglo–American jurisprudence is more than a location with seats for a judge, jury, witnesses, defendant, prosecutor, defense counsel and public observers." *Estes v. Texas*, 381 U.S. 532, 561, 85 S.Ct. 1628, 1642, 14 L.Ed.2d 543 (1965) (Warren, C.J., concurring). The Supreme Court of Pennsylvania referred to a court as that which, "when in session, is present in every part of the place set apart for its own use, and for the use of its officers, jurors and witnesses; and misbehavior anywhere in such place is misbehavior in the presence of the court." *In Re Mack*, 386 Pa. 251, 126 A.2d 679 (1956) (quoting *Ex parte Savin*, 131 U.S. 267, 277, 9 S.Ct. 699, 702, 33 L.Ed. 150 (1889)).

Although courts are thought to comprise only organizations of a permanent nature, history has shown that a court may be created for a specified period of time or for the duration of a specified event.[8] Even if one were to narrowly view the meaning of a court as a place or physical plant, that interpretation cannot be limited to a four-walled room in a courthouse. One reference defines a court as "a space which is *uncovered,*

8. For example, occupying powers established temporary courts in Germany and Japan after World War II. 20 Am.Jur.2d *Courts* § 1 (1965).

but which *may* be partly or wholly inclosed by buildings or walls." Black's Law Dictionary 318 (5th ed. 1979) (emphasis added). Instantly, Judge Snyder ordered that the police officer's testimony be given at the alleged crime scene. Therefore, the "uncovered" front lawn of the crime scene where the jury viewing took place is just as much a court as is the four-walled building from which Judge Snyder issued his directive.

In conclusion, we find that, for all intents and purposes, the alleged crime scene where the jury viewing took place became, temporarily, the "courtroom." Therefore, Judge Snyder correctly interpreted and applied Rule 328 to the facts before him. "If a judge may, for the purpose of maintaining order and decorum, control the taking of pictures in his own courtroom, it can hardly be successfully argued that his power stops when one closes the courtroom door." *Tribune Review Publishing Co. v. Thomas,* 254 F.2d 883, 885 (3d Cir.1958).

## II. Constitutional Claim

WJAC does not challenge the constitutionality of Rule 328; rather, it contends that Judge Snyder's extension of the Rule beyond the "courtroom or its environs" is an impermissible time, place and manner restriction of its constitutionally protected rights. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). Notwithstanding the question of whether Judge Snyder's order was authorized by Rule 328, we find that his order prohibiting photography of the jurors, the defendant, and the court personnel during the jury viewing is not an unreasonable time, place and manner restriction.

WJAC cites federal precedent for the proposition that "a time, place and manner restriction may be placed on otherwise constitutionally protected conduct if such restriction is reasonable, necessitated by a significant governmental interest, and narrowly tailored to promote that interest." (WJAC's Brief at p. 14). Regarding the facts of this case, WJAC contends that because the jury viewing was conducted outside, its photographing or videotaping neither disrupted the proceedings,

nor impaired any rights of the participants. In addition, WJAC contends that its videotaping did not affect any significant governmental interests. We cannot agree.

Specifically, WJAC argues that no "particularized concerns about the jurors" are at stake in this case. It bases its belief on the fact that all of the proceedings were open to the public—jury selection, the trial, sentencing, and the jurors' names were a matter of public record. In addition, WJAC contends that its conduct had no chance of "mak[ing] the jurors celebrities," as it (Mr. Setree) was positioned over 160 feet away from the viewing. It asserts that "[d]istance alone may well have eliminated any interference." (WJAC's Brief at p. 20). Last, WJAC argues that a juror's right to personal privacy, alone, is not a significant governmental interest necessitating the prohibition in question. In our view, WJAC has ignored the extraordinary effects of cameras on judicial proceedings.

■ The United States Supreme Court has held that the First and Fourteenth Amendments to the United States Constitution protect the right of the press and the public to attend criminal trial proceedings. *See Press–Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond, supra;* U.S. Const. amend. I; U.S. Const. amend XIV, § 1; *see also Commonwealth v. Fenstermaker*, 515 Pa. 501, 504 n. 1, 530 A.2d 414, 416 (1987) (holding that access rights of the news media, and of the general public, are identical in scope). This right, however, is not unqualified. The First Amendment does not guarantee the media a right of access to information greater than that of the general public. *See, e.g., Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *McMullan v. Wohlgemuth*, 453 Pa. 147, 308 A.2d 888

50

(1973) (relying on *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring)). More specifically, there is no United States Supreme Court case or Pennsylvania case which suggests that this right of access includes a right to televise, record, or otherwise broadcast judicial proceedings.

To the contrary, the Supreme Court has indicated that the First Amendment does not guarantee a positive right to televise or broadcast criminal judicial proceedings. In *Estes,* Justice Harlan, in concurrence, opined that:

> No constitutional provision guarantees a right to televise trials ... Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public.

381 U.S. 532, 588–89, 85 S.Ct. 1628, 1662–63 (1965) (Harlan, J., concurring); *see also Nixon, supra; Tribune Review Publishing Co. v. Thomas,* 254 F.2d 883 (3d Cir.1958); *In re Mack, supra.*

■ The *denial* of the right of access must be necessitated by a compelling governmental interest and narrowly tailored to serve that interest. *Globe,* 457 U.S. at 606–07, 102 S.Ct. at 2620. However, *limitations* on the right of access that resemble time, place, and manner restrictions on protected speech are not subjected to strict scrutiny. *Id.* at 606 n. 17, 102 S.Ct. at 2620 n. 17; *Richmond,* 448 U.S. at 581, n. 18, 100 S.Ct. at 2829 n. 18; *United States v. Hastings,* 695 F.2d 1278, 1282 (11th Cir.1983).

■ Judge Snyder's directive in this case fits the latter description. Rule 328 of the Pennsylvania Rules of Criminal Procedure, as it was applied to the case at hand, did not prohibit the public or the media from attending and observing the jury viewing; rather, it merely imposed a restriction on the manner by which the media, or persons generally, could

gather the news. Judge Snyder's order, therefore, merely *limited* the right of access. *Globe, supra.*

 A time, place, and manner restriction of the right to access judicial proceedings is constitutional if it is reasonable, if it promotes significant governmental interests, and if it does not unwarrantedly abridge opportunities for communication of thought. *Richmond, supra.* In *Richmond,* the Court held that, "[j]ust as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic . . . so may a trial judge in the interest of the fair administration of justice, impose reasonable limitations on the access to a trial." 448 U.S. at 581 n. 18 (citations omitted); *see also Young v. American Mini Theatres Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

Having defined the applicable level of scrutiny, we now weigh the countervailing governmental interests at stake. First, we address those interests which tend to favor the prohibition of media coverage of all judicial proceedings. Then, we will set forth those interests which tend to favor unrestricted or uninhibited television access to judicial proceedings.

Initially, we note that Judge Snyder's ban will not be examined in the context of the defendant's Sixth Amendment right to a fair trial because the defendant has expressly waived all such objections. *See* Note 5, *supra.* This opinion will, however, speak to the fundamental notion of fairness as it relates to the government's and the court's interest in the administration of justice.

## A. Reasons to Prohibit the Media Coverage of Judicial Proceedings

Preliminarily, we note that the primary concern of our court system is to ascertain the truth. Contrary to WJAC's contention that advancements in media equipment have eliminated many of the concerns articulated by Judge Snyder, experience teaches us that there are many situations in which undetecta-

ble subtleties can result in an unfair trial. Notwithstanding the open and obvious dangers that the media presents, we must be aware of, as Justice William O. Douglas once wrote, "the insiduous influences which it puts to work in the administration of justice." Douglas, *The Public Trial and the Free Press,* 33 Rocky Mt.L.Rev. 1 (1960).

## 1. Potential Impact on Jurors

"The potential impact of television [media coverage, generally] on the jurors is perhaps of the greatest significance." *Estes,* 381 U.S. at 545, 85 S.Ct. at 1634. The Court in *Estes* noted that although a jury is likely to be sequestered in high profile criminal trials, like the instant case, the jury will still enter the jury box knowing that they will be the subjects of great publicity and attention. *Id.*

> Where pretrial publicity of all kinds has created intense public feeling which is aggravated by the telecasting or picturing of the trial the televised jurors cannot help but feel the pressures of knowing that friends and neighbors have their eyes upon them ... [and, thus, the jurors] may well be led 'not to hold the balance nice, clear and true between the State and the accused.'

*Id.* (citation omitted from original). "It is easier for eight or nine elderly men to feel their way towards unanimity if they are not compelled to conduct their converging maneuvers under the microscopes and telescopes of the press, but are permitted to shuffle about a little in slippers." Herbert Albert Laurens Fisher, *An International Experiment* (1921). This knowledge of public sentiment, therefore, may impact the jurors' decisions.

Next, the knowledge that the trial is being televised may diminish the jury's attentiveness. *Estes,* 381 at 546, 85 S.Ct. at 1634; *see also* Joseph F. Flynn, *Prejudicial Publicity in Criminal Trials: Bringing Sheppard v. Maxwell into the Nineties,* 27 New Eng.L.Rev. 857 (1993); Nancy T. Gardner, *Cameras in the Courtroom: Guidelines for State Criminal Trials,* 84 Mich.L.Rev. 475 (1985). "Human nature being what it is, not only will a juror's eyes be fixed on the camera,

but also his mind will be preoccupied with the telecasting rather than with the testimony." *Estes,* 381 U.S. at 546, 85 S.Ct. at 1634; *see also Sheppard v. Maxwell,* 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522–23, 16 L.Ed.2d 600 (1966) ("Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused."). Finally, with media coverage of judicial proceedings, new trials would be rendered pointless as potential jurors will often have seen and heard the original trial, or portions thereof, when it was broadcasted.

In this case, the psychological effects of the camera on the jurors are readily apparent. The record indicates that Mr. Setree arrived at the scene of the jury viewing just prior to the arrival of the jurors. Upon the jurors arrival, Mr. Setree commenced filming them as they exited their automobiles. Aware of this fact, one of the jurors refused to leave his or her automobile until Mr. Setree ceased videotaping. This episode, alone, demonstrates the powerful influence of the camera.

### 2. Potential Impact on Witnesses

The knowledge that the proceedings are being filmed may have various consequences on the quality of testimony given at trial. Some witnesses "may be demoralized and frightened, some cocky and given to overstatement; memories may falter, as with anyone speaking publicly, and [the] accuracy of statement[s] may be severely undermined." *Estes,* 381 U.S. at 547, 85 S.Ct. at 1635; *see also United States v. Kerley,* 753 F.2d 617, 622 (7th Cir.1985) ("Even in an era of lightweight, silent, unobtrusive television cameras, there is a sense that the knowledge of being televised might cause the . . . witnesses to be distracted—whether by embarrassment, self-consciousness, anxiety or desire to 'star.' ").

The psychological effects of distractions on witnesses have been considered a serious enough threat to the fair administration of justice to justify excluding spectators from the courtroom during the testimony of particular witnesses. Spe-

cifically, courts have prohibited public attendance in order to protect witnesses against possible reprisal, and to prevent embarrassment and emotional disturbance to witnesses. *See People v. Hagan,* 24 N.Y.2d 395, 300 N.Y.S.2d 835, 248 N.E.2d 588 (1969) (spectators excluded due to witness' fear of reprisal for testifying against alleged murderers of Malcolm X); *State v. Smith,* 123 Ariz. 243, 599 P.2d 199 (1979) (excluding spectators during a rape victim's testimony) and; *State v. Santos,* 122 R.I. 799, 413 A.2d 58 (1980) (excluding spectators while witness testified to details of a sexual assault). If these concerns justify excluding the public and print media, they certainly justify banning the television medium, where the risk of inhibiting complete and honest testimony is even greater. *See, e.g., Hagan, supra* (excluding the electronic media because of the fear of reprisals against witnesses).

### 3. Personal Privacy Interests

WJAC asserts that the actions of Mr. Setree did not interfere with the personal privacy of any trial participant as Mr. Setree was positioned approximately 160 feet away from the viewing. In addition, WJAC contends that no privacy rights were violated because, prior to the incident in question, many of the juror's names were already made public. We disagree with WJAC's reasoning and conclusions because, due to the pervasiveness of television coverage, the publication of names are different than the telecasting of faces.

Opponents of broadcasting judicial proceedings argue that the privacy interests of trial participants. are more easily threatened by the broadcast than by the print media. *See* Cotsirilos & Jenner, *Cameras in the Courtroom—An Opposing View,* Ill. Trial Law.J. at 24 (Fall–Winter 1982) (television coverage magnifies the trauma of crime victims); Note, *Televised Trials: Constitutional Constraints, Practical Implications, and State Expiramentation,* 9 Loy.U.Chi.L.J. 910, 918 (1978) ("The camera's unique ubiquitousness dictates a reconsideration of conventional notions of privacy when evaluating that medium's impact on a judicial proceeding."). The theory that television is a more pervasive medium than newsprint has been substantiated by studies conducted on the subject. In

fact, a 1981 survey indicates that while 98% of American homes have a television set, only 54% of Americans purchase morning and/or evening newspapers. Note, *Television in the Courtroom—Limited Benefits, Vital Risks?*, 3 Comm. 35, 41 (1981). With these statistics in mind, the psychological effects of broadcasting on jurors and other trial participants become even more evident.

### 4. Burden on Trial Judges

The presence of television during judicial proceedings places additional responsibilities on the trial judge. *Estes*, 381 U.S. at 548, 85 S.Ct. at 1635. For example, cameras burden judges by making it more difficult to empanel an impartial jury in the event of a new trial, by requiring larger jury panels, and by increasing the necessity of marshals and the sequestration of jurors. *See Judicial Conference Ad Hoc Committee on Cameras in the Courtroom, Report to the Chief Justice of the United States and Members of the Judicial Conference of the United States* (1984). These burdens serve to frustrate the trial judge's primary task of seeing that the accused receives a fair trial.

### 5. Impact on the Defendant

The effects of broadcasting judicial proceedings on the defendant must not be overlooked. The camera may prejudice the defendant by affecting his or her disposition and testimony at trial. "The inevitable close-ups of his gestures and expressions during the ordeal of his trial might well transgress his personal sensibilities, his dignity, and his ability to concentrate on the proceedings before him...." *Estes*, 381 U.S. at 549, 85 S.Ct. at 1636. In addition, television coverage might deprive a defendant of his or her right to effective counsel. Not only may the broadcasting serve to distract counsel, but may also tempt lawyers, judges, jurors and witnesses to play to the public audience. *Id.*

In summary, the broadcasting and/or filming of judicial proceedings may have profound effects on the jurors, the witnesses, the attorneys, the judge, and on the truth-determining function of the court itself. In light of these consider-

ations, we find that filming or recording the participants to a court proceeding, while they are engrossed in the determination of matters of tremendous import, is repugnant to the high standard of judicial decorum to which our courts are accustomed.

### B. Reasons for Allowing Uninhibited Television Access

We now turn to the competing interests which arguably favor permitting media coverage of judicial proceedings. Some assert that the First Amendment values which support public trials also support televised trials.

Three First Amendment philosophies have been set forth by the United States Supreme Court concerning the right of access. First, the right of access to criminal trials fosters public confidence in the fairness of the criminal justice system. *Press–Enterprise,* 464 U.S. at 507–08, 104 S.Ct. at 822–23; *Globe,* 457 U.S. at 606, 102 S.Ct. at 2620; *Gannett Co. v. DePasquale,* 443 U.S. 368, 382, 99 S.Ct. 2898, 2907, 61 L.Ed.2d 608 (1979). Although the number of seats in courtrooms are limited, the sure knowledge that anyone is free to attend gives assurance that a fair trial will be conducted.

Second, the right of access also aids in the public oversight of the judiciary. "Public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Globe,* 457 U.S. at 606, 102 S.Ct. at 2620 (citations omitted); *see also* Justice Potter Stewart, Address at Yale Law School (Nov. 2, 1974), *in* 26 Hastings L.J. 631, 634 (1975) ("The primary purpose of the constitutional guarantee of a free press was ... to create a fourth institution outside Government as an additional check on the three official branches.").

Finally, some assert that the right of access serves as a "community therapeutic value." *Press–Enterprise,* 464 U.S. at 508–09, 104 S.Ct. at 823–24 (quoting *Richmond Newspapers,* 448 U.S. at 570, 100 S.Ct. at 2824). Criminal acts often provoke public outrage and the desire to retaliate. Opening

the trials, therefore, may abate some of this hostility by showing the public that justice is being served.

After considering the aforementioned interests, we find that televising judicial proceedings would not further any of these First Amendment concerns. As noted above, the right of access to criminal trials promotes public confidence in the criminal justice system. *Press–Enterprise, supra.* This public confidence is attributable to the openness of the trials— their availability to public scrutiny. However, we cannot see any enhancement of this confidence by permitting television coverage of the proceedings. Similarly, we do not believe that a live recordation would enhance either the function of public trials as a check on judicial abuses, or as a truth-finding function. To the contrary, the Supreme Court has held that, "[t]he use of television ... cannot be said to contribute to [the truth determining process] ... [But] [r]ather its use amounts to the injection of an irrelevant factor into court proceedings." *Estes,* 381 U.S. at 544, 85 S.Ct. at 1633.

Because Rule 328 of the Pennsylvania Rules of Criminal Procedure, and Judge Snyder's application thereof, did not violate WJAC's right of access and did not prohibit it from communicating to the public any of what its reporters observed, the application of the Rule was simply a *limitation* on the right of access. *Globe, supra; Richmond, supra.* We find, therefore, that Judge Snyder's directive was a time, place and manner restriction which should not be subjected to strict scrutiny, but should be upheld as reasonable. *Globe, supra; Richmond, supra.* In light of the important governmental and institutional interests articulated above, Rule 328, generally, and as applied to the facts of this case, is a reasonable time, place and manner restriction, and is constitutional.

Order affirmed.

WIEAND, J., concurred in the result.