J-A05003-20

2020 PA Super 161

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN C. HELD | : | |
| | : | |
| | : | No. 81 WDA 2019 |
| APPEAL OF: TRIB TOTAL MEDIA, LLC | : | |
| AND RICH CHOLODOFSKY | : | |

Appeal from the Order Entered December 28, 2018
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0001218-2018

BEFORE:   BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

OPINION BY BENDER, P.J.E.:                          FILED JULY 08, 2020

After the public corruption trial of former Westmoreland County Sheriff

Jonathan C. Held ("Held") ended in a mistrial due to a hung jury, Trib Total

Media, LLC and Rich Cholodofsky[1] ("TTM" or "Appellants"), intervened, seeking

public disclosure of the jurors' names.  The trial court entered an order

granting the release of the names, but only after Held's still-pending criminal

charges were resolved.  Appellants filed this interlocutory appeal challenging

the court's decision to delay the disclosure of the jurors' names as a violation

of the First Amendment.  After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Mr. Cholodofsky is a reporter employed by Trib Total Media, LLC.

At CP-65-CR-0001218-2018, the Office of the Attorney General ("OAG") charged Held with conflict of interest, 65 P.S. §1103; theft, 18 P.S. § 3921(a); and diversion of services, 18 P.S. § 3926(b); based on accusations that Held used public employees and resources of the Westmoreland County Sherriff's Office to aid in his re-election campaign. Naturally, the case attracted significant attention from the media in Westmoreland County, including TTM. On December 5, 2018, TTM filed a motion to intervene in Held's ongoing trial "for the limited purpose of filing a motion for public access to trial evidence...." See TTM's Motion to Intervene, 12/5/18, at 2 ¶ 4. Two day later, the trial court declared a mistrial "following a poll of the jury and the refusal of one juror to affirm a guilty verdict." Trial Court Opinion ("TCO"), 3/27/19, at 2. On December 13, 2018, the trial court issued an order 1) scheduling a status conference for December 28, 2018, and 2) directing the Clerk of Courts to "not release the names of the jurors ... absent further [o]rder" from the court. Order, 12/13/18, at 1 (single page).

TTM then filed a motion specifically seeking the release of the jurors' names, arguing, inter alia, that the First Amendment compelled the court to release them pursuant to our Supreme Court's decision in Commonwealth v. Long, 922 A.2d 892 (Pa. 2007). Motion for Access to Juror Names, 12/17/18, at 3-4 ¶¶ 12-14. The trial court held a hearing on that motion and other matters on December 28, 2018. After hearing argument, the court entered the at-issue order, granting, inter alia, the motion to disclose the jurors' names with the caveat that "the names may not be revealed until the

- 2 -

charges against [Held] have been finally resolved."  Order, 12/28/2018, at 1 ¶ 5 (hereinafter "temporary closure order").

TTM filed a timely notice of appeal from that order, and also filed a timely, court-ordered Pa.R.A.P. 1925(b) statement.   The trial court issued its Rule 1925(a) opinion on March 27, 2019.   Appellants now present the following questions for our review:

> 1 Did the trial court violate the First Amendment rights of [TTM] by refusing to release the names of the jurors after they were discharged?
>
> 2. In light of the holding in … Long, … did the trial court err in withholding [the] jurors' names for the duration of the prosecution of [Held] without issuing contemporaneous, appropriate findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest?
>
> 3. Did the trial court err in concluding that releasing the names of discharged jurors while charges remained pending against [Held] would violate the [Held]'s right to a fair retrial?
>
> 4. Did the trial court err in refusing to release the names of discharged jurors where the prosecution and [Held] did not object to their release?

TTM's Brief at 4.   Appellants' claims are interrelated and, thus, we address them together.

We begin by noting that the jurisdiction of this Court is not in question, as it "is well settled that an order that denies a request for public access to a criminal proceeding or judicial documents constitutes a collateral order from which an immediate appeal may be taken."  Commonwealth v. Selenski, 996 A.2d 494, 495 n.2 (Pa. Super. 2010).   Moreover, a claim that concerns the "constitutional right of public access to a judicial proceeding raises a pure

question of law.  Our standard of review, therefore, is de novo, and our scope of review is plenary."  Id. at 496.

The Supreme Court of the United States has "firmly established … that the press and general public have a constitutional right of access to criminal trials" pursuant to the First Amendment.  Globe Newsp. Co. v. Super. Ct. for Norfolk County, 457 U.S. 596, 603 (1982).  In Globe, the Supreme Court considered a challenge to a state statute that required judges overseeing criminal "trials for specified sexual offenses involving a victim under the age of 18, to exclude the press and general public from the courtroom during the testimony of that victim."  Id. at 598.  The Globe Court determined that the First Amendment's right of public/media access to criminal trials was implicated by the statute, and applied the following framework for analyzing its constitutionality:

> Although the right of access to criminal trials is of constitutional stature, it is not absolute.  But the circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one.  Where, as in the present case, the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.

Id. at 606–07 (citations omitted).

The Globe Court recognized that "safeguarding the physical and psychological well-being of a minor" was a compelling government interest.  Id. at 607.  However, the Court determined that the remedy, "a mandatory closure rule," was not narrowly tailored to that interest, because "the

- 4 -

circumstances of the particular case may affect the significance of the interest. A trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim." Id. at 607–08.

In Long, the Supreme Court of Pennsylvania considered the First Amendment's public-access-to-criminal-trials doctrine, as articulated in Globe, in the narrower context of media access to the identities of jurors from a criminal trial. During the jury's deliberations in Long, a television station intervened, seeking access to the jurors' names and addresses. The trial court denied their request, prompting the station to appeal (an identical procedural posture to the instant matter). This Court initially affirmed after determining "that the First Amendment right of access was a right to attend court proceedings; it did not compel the trial court to reveal the jurors' names and addresses." Long, 922 A.2d at 896 (summarizing this Court's reasoning for affirming the trial court's order). However, the Pennsylvania Supreme Court reversed that decision.

Our Supreme Court first determined that access to the identities of jurors was, in fact, a right subsumed within the First Amendment's public-access-to-criminal-trials doctrine, but that the right applied only to their names, not their addresses. Id. at 904 ("Taking in mind the tradition of accessibility, as well as the competing values of openness versus the promotion of jury service, the conclusion is inescapable. We believe the First Amendment provides a qualified right of access to jurors' names, but not addresses."). The Court went on to note that:

> In this way, the public will be provided with enough information to confirm the identity of jurors when necessary. Disclosing jurors' names furthers the objective of a fair trial to the defendant and gives assurances of fairness to society as a whole. But the average citizens' concern that the media will be camped out on their front lawn and fear of physical harm can be alleviated.

Id. at 904–05.

The Long Court then considered whether the trial court's refusal to disclose the jurors' names was narrowly tailored to serve a compelling government interest.[2] See id. at 905. The Court first noted that a trial court

> may find that disclosing the jurors' names in a particular circumstance raise concerns for juror safety, jury tampering, or juror harassment. Similarly, a court may be justified in withholding jurors' names for the duration of the case until the case is decided and judgment is rendered. Such closures, however, must be supported by appropriate findings.

Id. After considering the justification provided by the trial court, the Long Court determined that the trial court's reasons for closure were not substantiated by appropriate findings beyond "general concerns for harassment or invasion of privacy [that] would exist in almost any criminal trial." Id. at 906. The Long Court concluded by holding that a court's decision to withhold jurors' names based on their privacy concerns "must be supported by specific findings demonstrating that there is a substantial probability that

---

[2] This constitutes a 'strict-scrutiny' standard. "Under the strict-scrutiny test," the government has "the burden to prove" that the restriction on a First Amendment right is (1) narrowly tailored, to serve (2) a compelling state interest. Republican Party of Minnesota v. White, 536 U.S. 765, 774–75 (2002).

an important right will be prejudiced by publicity and that reasonable alternatives to closure cannot adequately protect the right." Id.

\* \* \*

In its Rule 1925(a) opinion, the trial court recognized the authority of Long and ostensibly applied the strict-scrutiny standard set forth therein. See TCO at 3. The court justified the temporary closure order as follows:

> [A]s repeatedly stated on record at the December 28, 2018 hearing, we believe that [Held]'s right to a fair trial is paramount, and the premature disclosure of juror names could have a chilling effect on the potential juror panel which was to be summoned for voir dire on April 1, 2019. Additionally, because of this relatively short timeframe between the December mistrial and the retrial, which was originally scheduled for April, we feel that any potential negative implications precipitated by the censorship are minimal, and most certainly outweighed by [Held]'s right to a fair trial. Further, during argument, counsel for Intervenors could not articulate a precise reason for pre-retrial disclosure, apart from general, broad notions of public accessibility to criminal proceedings. N.T.[,] 12/28/18[,] at 40.

> Most importantly, because … Held['s] case has not yet reached final disposition, we find it distinguishable from Long, supra, wherein a verdict was rendered in the underlying criminal case months prior to the trial court's disposition of the media's motion. In fact, the matter sub judice is vastly different, in light of the mistrial, the media's quest for the name of a juror who prevented unanimity of decision, and the need to select another jury from the same pool of citizens. Above all, our ruling grants Intervenors access to juror names; however, … Held must first be re-tried prior to disclosure.

Id. at 4.

TTM claims the trial court's temporary closure order violated the First Amendment. More specifically, TTM asserts that the temporary closure order does not satisfy the Long standard, arguing that the court's findings were not

- 7 -

adequate under the demanding strict scrutiny standard. TTM takes specific issue with the court's insistence that it was acting in consideration of protecting the fairness of Held's trial, as neither Held nor the prosecution objected to the release of the jurors' names. TTM also asserts that the temporary closure order is not narrowly tailored to serve that interest in any event.

The Commonwealth largely agrees with TTM's analysis:

> The trial court's well-intentioned desire to protect … Held's constitutional right to a fair retrial on his criminal charges is laudable. However, its conclusion that this can only be achieved by temporarily withholding from the public the names of the jurors who participated in Held's first trial which resulted in a mistrial is not supported by the record, misapplies the governing law, and is unreasonable. More specifically, the voir dire process for selecting the jury for the retrial as well as the procedural rules governing change of venue are reasonable alternatives to secreting the names of the jurors of the first trial that will adequately and fully protect Held's right to a fair retrial. Because of this, and in light of the Pennsylvania Supreme Court's controlling decision in … Long, … the Order under review constitutes an abuse of discretion and should be reversed on that basis.

Commonwealth's Brief at 6.

\* \* \*

We begin our analysis by addressing the apparent agreement among the parties and the trial court that the temporary closure order is governed by Long. While we agree that Long clearly establishes a right to access the jurors' names under the First Amendment, we disagree with the parties and the lower court that the order here is subject to the strict-scrutiny standard

applied in that case. Here, the public-access-to-criminal-trials right has not been denied, it has been delayed.

"The denial of the right of access must be necessitated by a compelling governmental interest and narrowly tailored to serve that interest. However, limitations on the right of access that resemble time, place, and manner restrictions on protected speech are not subjected to strict scrutiny." Commonwealth v. Davis, 635 A.2d 1062, 1066 (Pa. Super. 1993) (citation omitted); accord Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 n.18 (1980) ("Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, see, e. g., Cox v. New Hampshire, 312 U.S. 569 ... (1941), so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial. "[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge ... the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." Id. at 574.... It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets.") (some citations omitted).

In Davis, the jury went to the crime scene of the murder. The trial court had previously "directed from the bench that no pictures would be permitted of the jury, the defendant, or court personnel." Davis, 635 A.2d at 1063. Subsequently, a

> freelance photographer … went to the crime scene to videotape the proceedings. Shortly after he arrived at the scene, both the Clerk of Courts and a member of the print media informed [him of the trial court's] order. Despite this information, [the journalist] continued to film the events. He filmed the jurors as they departed from their vehicles and as they received instructions from [the judge]. After being apprised of [his] conduct, [the trial court] directed that the videotape be confiscated.

Id. (footnote omitted). The photographer was working on behalf of a TV station, which intervened to challenge the confiscation order under the First Amendment.

The Davis Court first considered whether the trial court's authority extended to the crime scene where the jury was taken, and determined that he had at least temporary authority at that location at that time. See id. at 1065 (reasoning that because a "police officer's testimony [was heard by the jury] at the alleged crime scene[,] … the crime scene where the jury viewing took place [was] just as much a court as is the four-walled building from which [the judge] issued his directive"). The Davis Court next considered whether the court's order was an unreasonable time, place and manner restriction under the First Amendment, and concluded that it was not. Id. at 1070. In doing so, the Court balanced the institutional needs of the trial court in protecting the jurors and other aspects of the criminal trial process against the First Amendment right to open proceedings. The Davis Court expressly rejected use of the strict-scrutiny standard, because the trial court's order "did not prohibit [the TV station] from communicating to the public any of what its

- 10 -

reporters observed," but instead "was simply a limitation on the right of access." Id.

The instant case is analogous to Davis with respect to the First Amendment right at issue. Here, trial court's order did not completely deny access to the jurors' names, it delayed that access until Held's criminal case is resolved; that is, until after the criminal case is retried or the charges against Held are dismissed.[3] Thus, we are not presented with the complete denial of the right of access to the jurors' names as was the case in Long and, consequently, the strict-scrutiny test articulated therein does not apply. Instead, we consider whether the trial court's order is a reasonable restriction, furthering "significant government interests," but does not "unwarrantedly abridge" the ultimate right to access the jurors names. Davis, 635 A.2d at 1066 (citing Richmond, supra).

Significant Government Interests

The trial court expressed two concerns underlying the temporary closure order. The court determined that revelation of the jurors' names would have a "chilling effect" on "the potential panel which will be summoned for voir dire...." TCO at 5 (quoting the trial court's comments during the 12/28/18 hearing). Additionally, the court feared that the press's contacting the jurors could potentially disrupt the retrial. Id. at 6 (quoting again from its comments during the 12/28/18 hearing). These concerns both implicate an interest in a

---

[3] We discuss the potential ambiguity in this timeframe, infra.

defendant's right to a fair trial. Additionally, the court cited the jurors' right to privacy, which it believed was of particular concern in this case due to the manner in which the jury failed to reach a verdict, as it is undisputed that there was a solitary juror who refused to convict. Id. at 5. Both concerns implicate not just significant, but compelling government interests. See Commonwealth v. Genovese, 487 A.2d 364, 367 (Pa. Super. 1985) ("In an appropriate case, of course, the State may have a compelling interest to keep jury information confidential in order to guarantee the defendant's right to a fair trial or the juror's right to privacy.").

## Abridgment of the First Amendment Right

We must next consider the nature of the restriction involved. The order in question delays the release of the jurors' names, but it does not deny the right of access entirely. When contemplating the scope of the restriction at issue, we recognize that, in some circumstances, the temporary abridgment of a right may function as a complete denial of that right. For example, delaying an individual's right to vote on Election Day may risk denying the right entirely, for the world does not stop to wait for one person. When rights interact with human limitations brought on by age or health or other circumstances, time may be of the essence. What appears to be a minor time, place, and manner restriction in one instance, may be quite burdensome on the same right in another.

Here, however, we detect no significant concerns in the temporary delay of the release of the jurors' names. Furthermore, TTM has not proffered any

such concerns for our consideration. It is difficult to even speculate as to how the benefits of disclosure (as articulated in Long) would be significantly impacted by the delay.[4] Thus, we agree with the trial court that "the potential negative implications precipitated by the censorship are minimal…." TCO at 4. The jurors' names will ultimately be released, and thus the impact on the First Amendment right to public access is distinguishable from the impact at-issue in Long.

### Reasonableness

Even where the impact on a First Amendment right is small, and the government interests at stake is significant, as is the case here, a time, place, or manner restriction on a First Amendment right must still be reasonable. Thus, we next consider TTM's various concerns regarding the reasonableness of the temporary closure order.

_____

[4] Indeed, it is far easier to speculate the opposite. In Long, the Supreme Court noted that "[d]isclosing jurors' names furthers the objective of a fair trial to the defendant and gives assurances of fairness to society as a whole." Long, 922 A.2d at 905. Here, the jurors in question did not reach a verdict in Held's case, and they are no longer tasked with doing so. Thus, there may be even less value to disclosure here than in circumstances where a verdict has been reached, and where an investigation might uncover unfairness in the verdict due to issues pertaining to individual jurors, such as a juror's misconduct. Here, whatever unfairness resulted from the makeup of the jury in question has already been substantially remedied by the promise of a new trial. In any event, it is enough to say for purposes of our analysis that there does not appear to be a significant negative impact on the First Amendment right in question caused by the delay in disclosure in the circumstances of this case.

First, TTM repeatedly claims that the trial court's concerns were too general, asserting that:

> A general statement about protecting the defendant's right to a fair retrial applies in every case where a retrial may occur. There is nothing in this case that distinguishes it from any other case in which there will be a retrial, whether after a hung jury, a reversal on appeal and a remand for a new trial, or upon granting post-conviction relief.

TTM's Brief at 18.

Appellants doth protest too much. This is plainly not a typical criminal case. Held, a (former) law enforcement official, is accused of engaging in a form of public corruption while holding one of the highest elected positions in Westmorland County. Even among highly publicized cases, these unique circumstances inherently raise concerns about the trial's fairness (with respect to either party) that simply do not arise in the vast majority of criminal cases.

Furthermore, the procedural posture of this case is not at all common. Few cases result in mistrials, fewer in a mistrial due to a hung jury, and fewer still where a single holdout hangs the jury. TTM's argument applies the wrong analysis. The question is not whether the circumstances here are unique among similarly-situated trials, but whether the circumstances of this case that affect the significant government interests at stake are sufficiently unique among criminal trials generally. In Long, our Supreme Court was worried "about general concerns for harassment or invasion of privacy" that "would exist in almost any criminal trial." Long, 922 A.2d at 906. There are several circumstances present in this matter that justify heightened concerns for the

fairness of Held's retrial and the potential for juror harassment that simply do not arise in typical criminal cases.[5]

Additionally, we reject TTM's assertion that the trial court's concerns were not sufficiency particularized. The trial court extensively opined on the reason for its order during the 12/28/18 hearing. It was particularly concerned about the fact that, unlike in Long, the jury here had not reached a verdict due to a single juror. N.T., 12/28/18, at 4. This created a greater potential for juror harassment, and a greater potential for a "chilling effect" on the jury pool for the second trial. Id. Notably, the court did not express a general concern about a chilling effect on the jury pool for criminal trials generally, but instead was concerned about the voir dire process for the second trial in the very same case. Id. at 5-6. The court also found it difficult

_____

[5] TTM cites U.S. v. Wecht, 537 F.3d 222 (3d Cir. 2008), for persuasive authority. In Wecht, the District Court entered an order empaneling an anonymous jury, leaving the Third Circuit to consider "whether the District Court articulated the necessary findings and consideration of alternatives to overcome the presumption that the jurors' names should be publicly available." Id. at 239. The Third Circuit rejected the District Court's arguments that the significant publicity attached to the trial had presented sufficient, non-generic concerns about the jurors' privacy interests to overcome the presumption. Wecht is distinguishable, inter alia, because 1) it involved a complete denial of the right to disclosure of the jurors' names and, thus, was considered under the strict-scrutiny standard; and 2) the only circumstance recognized by the Third Circuit that was distinguishable from the typical criminal case in Wecht was the notoriety of the defendant (and the publicity that notoriety generated). Here, a less stringent standard applies, and several unique circumstances exist in addition to the public visibility of Held.

to imagine ways in which these problems could be adequately addressed with additional voir dire questions. Id. at 8-9. We conclude that the statements were sufficiency particularized.

TTM also complains that the trial court's assessment of the publicity associated with this case was "overstated," suggesting that only one news outlet, "not a dozen, sought the release of the names of the jurors below." TTM's Brief at 21. However, the publicity level of Held's prosecution is but one of several factors affecting the fairness of Held's retrial and the privacy concerns raised by disclosure in the unique circumstances of this case. Moreover, we are far from convinced that the number of news outlets seeking disclosure accurately describes the publicity level of the case.[6] Other news outlets may find it sufficient to rely on TTM's efforts so as not to duplicate legal expenses, and/or they may be content to investigate the identities of the jurors through other means.

Next, TTM claims that the trial court's concerns for the fairness of the retrial are inflated or illusory, because Held's counsel did not object to disclosure. Id. at 26. TTM stresses that Held may waive his right to a fair trial, and that Held's counsel "told the trial court in no uncertain terms that the names of the jurors should be released." Id.

_____

[6] TTM omits from its argument that another media outlet sought to intervene to access judicial records in this case. See WPXI's Motion to Intervene and Obtain Access to Public Judicial Records, 12/5/2018, at 1-2 (seeking disclosure of evidence admitted at Held's trial).

We find this argument unconvincing for two reasons. First, Held did not waive a right to a fair trial. Held's counsel, while participating in TTM's argument at the hearing on December 28, 2018, essentially determined that the precedent of Long was insurmountable. He stated,

> Your Honor, I've thought this through. My client and I have spoken about this. The law is, I do believe, and I agree with [TTM] on this point—I sort of changed my way of thinking after reading these cases. I think the law is clear. I think that it does permit the release of these names. But I make no other arguments other than to agree that the press has a right to these names, and it is a matter of public information and their access.

N.T., 12/28/18, 7-8 (emphasis added).

TTM misconstrues Held's counsel's statement. He offered his legal opinion that the case law was in favor of disclosure, and made "no other arguments...." Id. Moreover, he agreed that the names should be released, but made no comment about the trial court's decision to delay disclosure. There was no discussion with Held's counsel, whatsoever, regarding waiving any rights.

Second, we reject the inference that the trial court plays no role in preserving a defendant's rights merely because the defendant is empowered to waive them. TTM cites no authority for this proposition beyond the undisputed fact that a defendant may waive both constitutional and statutory rights. However, such waivers require the approval of the court. For instance, when a defendant seeks to waive his right to counsel, the trial court must conduct an extensive inquiry on the voluntariness of that waiver, and may ultimately reject the waiver if not satisfied with the result of that inquiry. See

Commonwealth v. Blakeney, 946 A.2d 645, 655 (Pa. 2008). Clearly, a trial court plays a significant role in the preservation of a defendant's trial rights, even in circumstances where a defendant explicitly seeks to waive them.

Finally, we address TTM's concern that the trial court's order to delay disclosure until Held's prosecution is 'finally resolved' is too ambiguous, suggesting that that "date could be a decade away." TTM's Brief at 14. However, after careful review of the trial court's statements at the 12/28/18 hearing, as well its Rule 1925(a) opinion, we conclude that the trial court clearly implied that Held's charges will be 'finally resolved' when his case reaches a verdict, not after all appeals and collateral attacks on the judgment of sentence are exhausted. To the extent that TTM poses hypotheticals that this case will not reach a verdict, the charges will also be resolved if Held pleads guilty, or if the charges are withdrawn or dismissed.

After considering each of Appellants' arguments, we conclude that the temporary closure order was a reasonable time/place/manner restriction that did not violate the First Amendment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/8/2020