922 A.2d 892

COMMONWEALTH of Pennsylvania,

v.

Karl LONG.

**Appeal of Tribune–Review Publishing Company.**

Supreme Court of Pennsylvania.

Argued May 9, 2006.

Decided May 31, 2007.

David Alan Strassburger, Ronald D. Barber, H. Yale Gutnick, Strassburger, McKenna, Gutnick & Potter, P.C., Pittsburgh, for Tribune–Review Pub. Co.

Howard M. Holmes, Mary Elizabeth Butler, Admin. Office of PA Courts, John W. Peck, II, Westmoreland County Dist. Attorney's Office, for the Com. of PA.

Walter P. DeForest, III, DeForest Koscelnik Yokitis & Kaplan, Altoona, for WPXI, Inc.

Frederick A. Polner, for appellant amicus curiae, Pennsylvania Ass'n of Broadcasters.

BEFORE: CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Chief Justice CAPPY.

In this appeal, we are asked to consider whether the press has a common law or constitutional right of access to the names and addresses of the jury panel in a criminal trial. The Superior Court held that the constitutional right of access was satisfied when the press attended the proceedings and did not separately guarantee the press access to the jurors' names and addresses. For the reasons detailed herein, we disagree with the Superior Court's conclusions. Accordingly, the Order of the court is reversed.

The instant dispute arose out of the prosecution of Karl Long for the murder of his wife. The trial court conducted jury selection from July 28 through July 30, 2003. The jury selection process was open to the public and at least one reporter of WPXI, Inc., a TV station, and the Tribune–Review Publishing Company, a local newspaper, (hereafter "Appellants") was present in the courtroom. During jury selection, the potential jurors were referred to only by number. At no time during jury selection did Appellants raise an objection to the process the court employed.

The trial proceeded from August 4 through August 20, 2003. During this time, the trial court learned that two of Appellants' reporters were attempting to secure the names and addresses of the impaneled jury through members of the court's judicial staff. N.T., 8/15/2003, 1962–63. The reporters, however, did not file a request for this information at this time.

On August 15, 2003, near the close of trial and on its own initiative, the trial court raised concerns about events having the potential to jeopardize the jury's performance of its duties. N.T., 8/15/2003, 1956–1964. Specifically, the court was concerned with incidents involving the victim's family "staring at people, standing near automobiles, um, or jurors." N.T., 8/15/2003, at 1957. The court also raised concerns about the requests for the jurors' names and addresses by the press. N.T., 8/15/2003, at 1962–63. The court tentatively arranged to sequester the jury because of its concerns for "protecting the jury as much as I can. And that includes not revealing their names and addresses." N.T., 8/15/2003, at 1963. Ultimately, however, the court did not sequester the jury, but made alternative arrangements.

██  On August 20, 2003, while the jury was still deliberating, Appellants requested a hearing on the question of their right to the jurors' names and addresses. N.T., 8/20/2003. They filed Motions to Intervene to this effect the next day and a hearing on the matter was scheduled for September 2, 2003.[1] During the hearing, Appellants asserted that they needed the jurors' names and addresses in order to verify the identity of the jurors.[2] Such information was required "for the public to be able to know who is on that jury and how they have been selected." *See* N.T., 9/2/2003, at 7, 17. Following the hearing, the court granted Appellants standing on September 17, 2003. The trial court held a second hearing in November of 2003 and ultimately denied Appellants' petitions on December 31, 2003.

The trial court reasoned that the jurors' names and addresses could not be disclosed under Rule 632 of the Pennsylvania Rules of Criminal Procedure and the concomitant Administrative Order of the Westmoreland County Court of Common Pleas. Rule 632 provides that Juror Questionnaires shall not

1. In Pennsylvania, a Motion to Intervene is the proper vehicle for the press to raise a right of access question. *Commonwealth v. Fenstermaker*, 515 Pa. 501, 530 A.2d 414, 416 n. 1 (1987).

2. Appellants refer to both "identity" and "names and addresses" interchangeably, implying that a jurors' identity includes names and addresses. For ease of discussion, we will refer to jurors' names and addresses rather than identity.

constitute a public record and the related administrative order provided for the destruction of Juror Questionnaires at the conclusion of the proceedings.[3] The trial court explained that the names and addresses were part of the Juror Questionnaire and the confidentiality provisions protect all of the information on those forms, including the jurors' names and addresses. The court also concluded that "[Appellants] have not presented the Court with any controlling authority demonstrating that these procedures are unconstitutional." *Commonwealth v. Long*, 86 Westmoreland Law J. 89, 95 (2003).

Appellants appealed to the Superior Court challenging the trial court's refusal to release the jurors' names and addresses as violative of the common law right of access and of the constitutional right of access to criminal trials guaranteed by the First Amendment of the United States Constitution and Article 1, Section 11 of the Pennsylvania Constitution. U.S. CONST. amend. 1; PA. CONST. art. 1, § 11.[4],[5]

3. Juror Questionnaires are provided to potential jurors before the start of *voir dire* and contain routine questions about the juror. Pa.R.Crim.P. 632(A). The trial judge and attorneys receive copies of the questionnaires for use during *voir dire*. *Id.*

4. Appellant, WPXI, appealed under the First Amendment of the United States Constitution and Article 1, Section 9 and Article 1, Section 11 of the Pennsylvania Constitution. The Superior Court explained that WPXI's challenge based on Article 1, Section 9 was waived for failing to raise it in its Concise Statement of Matters Raised on Appeal. *See Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306 (1998). Appellant, Tribune Review, also did not appeal under Article 1, Section 9. Accordingly, the only constitutional provisions before us are the First Amendment of the United States Constitution and Article 1, Section 11 of the Pennsylvania Constitution.

5. The right of access to criminal trials is embodied in the First Amendment of the United States Constitution, which provides as follows:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. CONST. amend. I.

Additionally, the Pennsylvania Constitution provides the following right to the citizens of this Commonwealth:

All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such

The Superior Court affirmed the trial court's decision. *Commonwealth v. Long,* 871 A.2d 1262 (Pa.Super.2005). The court concluded that the First Amendment right of access was a right to attend court proceedings; it did not compel the trial court to reveal the jurors' names and addresses. *Long,* 871 A.2d at 1269. "Inasmuch as the [Appellants] have not contended that they have been denied access to any judicial proceedings or to any transcripts of judicial proceedings, we conclude ... that the [Appellants'] constitutional qualified right of access has not been violated." *Id.*

In reaching this conclusion, the court initially explained that the First Amendment qualified right of access forbids closure of the proceedings. *See id.* at 1269–70 (citing *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II*)). This case, however, did not involve closure, since all of the proceedings, including *voir dire,* were open to the public and press. *Id.* at 1270. Accordingly, the court believed it did not need to undertake any further First Amendment analysis. The court also looked to other states' case law for support, relying on *Gannett Co. v. State of Delaware,* 571 A.2d 735 (Del.1989), for the proposition that even if the *Press–Enterprise* analysis were applicable, the First Amendment did not encompass a right of access to jurors' names and addresses. *Long,* 871 A.2d at 1270–71. Last, the court considered other sources, including legislation from other states, demonstrating an intent to protect the privacy interests of jurors in instances such as those present in this case. *Id.* at 1271–72.

The court next examined whether a common law right of access required access to jurors' names and addresses under *Commonwealth v. Fenstermaker,* 515 Pa. 501, 530 A.2d 414 (1987). This court in *Fenstermaker* held that public judicial documents must be open to the public. *Long,* 871 A.2d at 1275. The court explained that prior Superior Court case law interpreting *Fenstermaker* looked at whether the document

manner, in such courts and in such cases as the Legislature may by law direct.
PA. CONST art. 1, § 11.

was docketed, formally filed with the court, or required by a rule of procedure, in determining its public nature. *Id.* Because the jurors' names and addresses were not part of the public record or required by any rule of criminal procedure, the court concluded that no common law right of access required their disclosure. *Id.* at 1276.

Appellants filed a Petition for Allowance of Appeal with this court, which we granted, limited to the following issue:

> Whether the First Amendment to the United States Constitution, Article I, Section 11 of the Pennsylvania Constitution, and/or the common law provide a right of access to the names and addresses of impaneled jurors in a criminal case?

*Commonwealth v. Long,* 584 Pa. 438, 884 A.2d 249 (2005).

■ Preliminarily, we note that this court has jurisdiction over the instant matter as an appeal as of right from a collateral order. Pa.R.A.P. 313. Furthermore, while Appellants have obtained access to the jurors' names and addresses in this case and the issue is therefore moot, we will review the issues raised since they are capable of repetition yet likely to evade review and involve an issue important to the public interest. *Public Defender's Office of Venango County v. Venango County Court of Common Pleas,* 586 Pa. 317, 893 A.2d 1275 (2006). Because this case presents only questions of law, our standard of review is *de novo* and our scope of review is plenary. *Buffalo Twp. v. Jones,* 571 Pa. 637, 813 A.2d 659 (2002).

■ We turn first to the argument that the common law provides a right of access to the names and addresses of impaneled jurors in a criminal case, since it is the policy of this Court to resolve claims on non-constitutional grounds in the first instance. *See In re Fiori,* 543 Pa. 592, 673 A.2d 905, 909 (1996) (courts should avoid constitutional issues when the issue at hand may be decided upon other grounds); *Commonwealth v. Kennedy,* 583 Pa. 208, 876 A.2d 939, 949 n. 10 (2005); *Commonwealth v. Allsup,* 481 Pa. 313, 392 A.2d 1309, 1311 (1978) (policy of this Court is to avoid the resolution of constitutional questions when there appears a non-constitu-

tional ground for decision). Preliminarily, we note that there is overlap between the common law and the constitutional inquiries, since both rights of access seek to foster the fairness and the appearance of fairness of the criminal justice system by ensuring that the public has access to proceedings. *See Fenstermaker*, 530 A.2d at 417–18. Nevertheless, there is a distinction between the two inquiries, as the First Amendment provides a greater right of public access than the common law.[6] *See, e.g., Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir.2006). For the reasons that follow, we conclude that there is no common law right of access to jurors' names and addresses.

In *Nixon*, 435 U.S. at 597, 98 S.Ct. 1306, the Supreme Court articulated that "[i]t is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." In Pennsylvania, we recognized a similar common law right to access public judicial records in *Fenstermaker*. *See Uniontown Newspapers, Inc. v. Roberts*, 576 Pa. 231, 839 A.2d 185 (2003). Adopting the reasoning of the United States Supreme Court, we explained that members of the public have an interest in observing criminal justice processes to be assured that offenses perpetrated against them are dealt with in a manner that is fair to their interests and fair to the interests of the accused. *Fenstermaker*, 530 A.2d at 417.

The threshold inquiry in a case invoking the common law right of access is whether the documents sought to be

---

**6.** This distinction is based on what is being accessed and the nature of the legal tests applied to evaluate the right of access. In Pennsylvania the common law right of access speaks in terms of public access to "inspect and copy" the documents themselves, while the United States Supreme Court has spoken of the First Amendment right as accessing the judicial proceedings and the "information" contained therein. *See, e.g., Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Additionally, the common law test requires the trial court to balance the presumption of openness against the circumstances warranting sealing of the document, *see Fenstermaker supra*, whereas under the First Amendment the proceedings can be closed only upon showing a compelling government interest and any restrictions must be narrowly tailored to serve that interest, *see* discussion of *Press–Enterprise II infra* at 905.

disclosed constitute public judicial documents. *Id.* at 418. Furthermore, there is a "presumption—however gauged—in favor of public access to judicial records." *Id.* Documents that are filed with the court and, in particular, those that are used by the judge in rendering a decision are clearly considered public judicial documents. *Id.* (probable cause affidavits filed with the magistrates and used by them when deciding whether to issue arrest warrants are judicial records). Conversely, documents that are not public judicial documents include transcripts of bench conferences held *in camera* and working notes maintained by the prosecutor and defense counsel at trial. *Id.*

As a general matter, a list containing the names and addresses of impaneled jurors is not entered into evidence and is not required to be kept by any rule of the Pennsylvania Rules of Criminal Procedure.[7] The names do not otherwise become part of the record and are not made available to the public. Furthermore, such a list is not part of the certified record on appeal. More importantly, this information is not the type of information upon which a judge bases his or her decision. *Fenstermaker, supra.* Therefore, in Pennsylvania, there is no list of jurors' names and addresses that becomes part of the public judicial record and jurors' names and addresses are not subject to a common law right of access.[8]

---

7. Although the jury array is considered a public judicial record under 42 Pa.C.S. § 4524, it does not follow that the list of impaneled jurors is also considered a public judicial record. The issue of whether the public has a right of access to the jury array is not presently before the Court.

8. In this case, the Westmoreland County Court of Common Pleas had an administrative order, effective June 1, 2000, which provides for the original juror roster to be filed under seal with the Prothonotary. We recognize that the Third Circuit has included sealed records in its list of public judicial documents. *See In re Cendant Corp.*, 260 F.3d 183, 192 (3rd Cir.2001) (providing that "the public right of access clearly applies to the in camera hearing conducted by the District Court, as that hearing was a judicial proceeding."). That decision, however, does nothing to alter our conclusion in this case. Not only are we not bound by decisions of the Third Circuit, *Commonwealth v. Cox*, 581 Pa. 107, 863 A.2d 536 (2004), but also we believe that documents placed under seal are similar to transcripts of bench conferences held *in camera. See Fenstermaker supra; but see Cendant*, 260 F.3d at 192. In either

Having concluded that there is no common law right of access to impaneled jurors' names and addresses, we must consider Appellants' alternative constitutional argument. The United States Supreme Court has not entertained the precise issue before us. Nevertheless, it has laid the foundation for analyzing a First Amendment claim of access. Our constitutional inquiry begins with two decisions of the United States Supreme Court. In *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), the Court entertained the question of whether the First Amendment guaranteed the public a right of access to criminal trials. The Court first explained that the plurality opinion in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), held that the right of access was embodied in the First Amendment of the United States Constitution as it was necessary to the enjoyment of other First Amendment rights, including the informed discussion of governmental affairs. *Globe,* 457 U.S. at 603–04, 102 S.Ct. 2613. The Court then answered the question presented by considering whether the criminal trial was historically open to the press and public and whether the right of access played a significant role in the functioning of the judicial process as a whole. *Id.* at 605–06, 102 S.Ct. 2613. Answering these questions affirmatively, the Court concluded, "the institutional value of the open criminal trial is recognized in both logic and experience." *Id.* at 606, 102 S.Ct. 2613.

In these cases, the Court also generally agreed that the right of the press and public were synonymous, since the media effectively functions as surrogates for the public. *Richmond,* 448 U.S. at 573, 100 S.Ct. 2814. Moreover, the Court indicated that the right of access was a right to gather information and not just a right to attend the proceedings. *Id.* at 576, 100 S.Ct. 2814 ("It is not crucial whether we describe this right to attend criminal trials to hear, see, and

instance, the trial court's intentions to remove such proceedings from the public are clear. It is well settled that a trial court has a good deal of discretion in controlling the proceedings as it sees fit. 42 Pa.C.S. § 323. Accordingly, the existence of the Westmoreland County administrative order does not change our resolution of this matter.

communicate observations concerning them as a right of access, or a 'right to gather information ...'"); *id.* at 583, 100 S.Ct. 2814 ("Today, however, for the first time, the Court unequivocally holds that an arbitrary interference with access to important information is an abridgement of the freedoms of speech and of the press protected by the First Amendment.") (Stevens, J. concurring); *id.* at 585, 100 S.Ct. 2814 ("The Court's approach in right of access cases simply reflects the special nature of a claim of First Amendment right to gather information.") (Brennan, J. concurring); *see also United States v. Antar,* 38 F.3d 1348 (3d Cir.1994) (explaining that the First Amendment right of access extends to information contained in the proceedings).

Two years after *Globe,* the Court employed an historical analysis and a review of case law to conclude that the First Amendment right of access encompassed *voir dire.* See *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*"Press Enterprise I"*). The criminal trial at issue involved the rape and murder of a teenage girl. The trial court allowed the press to attend general *voir dire,* but denied the press access to individual *voir dire.* In rejecting the trial court's decision to close the *voir dire* proceedings, the Court explained, "[t]he process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system." *Id.* at 506, 104 S.Ct. 819. The court examined the historical practice, concluding that jurors had traditionally been selected in public. *Id.* at 507, 104 S.Ct. 819. Furthermore, the Court explained:

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

*Id.* at 508, 104 S.Ct. 819 (emphasis in the original). Accordingly, the Court concluded that a presumption of openness attached to *voir dire. Id.* at 510, 104 S.Ct. 819. The Court then turned to consideration of the *voir dire* process itself, including a discussion of when *in camera* proceedings may be appropriate. The Court noted that a "valid privacy right may rise to a level that part of the transcript should be sealed, *or the name of a juror withheld,* to protect the person from embarrassment." *Id.* at 512, 104 S.Ct. 819 (emphasis added).

It was not until *Press–Enterprise II,* however, that the Court formally adopted the "experience and logic" test that was first announced by Justice Brennan in *Globe.* In *Press–Enterprise II,* the Court was confronted with the question of whether the press had a First Amendment right of access to the transcript of a preliminary hearing in California. In answering this question, the Court looked at whether such right was consistent with "experience and logic." The "experience" inquiry considers whether there has been a "tradition of accessibility." *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. 2735. In other words, a court looks to "whether the place and process have historically been open to the press and general public." *Id.* A "tradition of accessibility implies the favorable judgment of experiences." *Id.* The "logic" inquiry focuses on "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* In conducting this inquiry, a court should consider whether the process enhances the fairness of the criminal trial as well as "the appearance of fairness so essential to public confidence in the system." *Id.* at 9, 106 S.Ct. 2735. These considerations are related as they "shape the functioning of governmental processes." *Id.* If the right asserted is grounded in both experience and logic, then a right of access to the proceedings in question exists under the First Amendment.

The Court then applied the "experience and logic" test to preliminary hearings, explaining that from the trial of Aaron Burr in 1807 to the present day, "the near uniform practice of state and federal courts has been to conduct preliminary hearings in open court." *Id.* at 10, 106 S.Ct. 2735. Moreover,

in California, the scope of the preliminary hearing is extensive and "often the final and most important step in the criminal proceeding." *Id.* at 12, 106 S.Ct. 2735. "Denying the transcript of a 41–day preliminary hearing would frustrate what we have characterized as the 'community therapeutic value' of openness." *Id.* at 13, 106 S.Ct. 2735. Accordingly, the Court concluded that the First Amendment right of access to criminal proceedings applied to preliminary hearings "as they are conducted in California." *Id.*

The Court cautioned, however, that the right of access was not absolute. *Id.* Rather, a trial court can close the proceedings when it demonstrates an overriding interest "to preserve higher values," including the right of the accused to a fair trial. *Id.* at 14, 106 S.Ct. 2735. In such instances, the closure must be narrowly tailored to serve the interest in question. *Id.* Consequently, the right of access is only a "qualified right." After examining the qualified nature of the right, the Court concluded that the standard employed by the California Court failed to consider the First Amendment right of access to criminal proceedings and reversed the order of the court below. *Id.* at 15, 106 S.Ct. 2735.

Turning to the specific question before our court, whether the First Amendment right of access encompasses impaneled jurors' names and addresses, we now consider the experience and logic attending to that practice. Preliminarily, it has been suggested by both jurists and commentators that revealing the names and addresses of the jurors is inseparable from the *voir dire* process itself. From this perspective, it is asserted that *Press–Enterprise I* makes this clear when it discusses the withholding of the name of the juror during *voir dire* as an exception to the general rule, *see infra* at 900; and there is no need to look any further than the Court's analysis in *Press–Enterprise I*. *See, e.g., State ex rel. Beacon Journal Pub. Co. v. Bond*, 98 Ohio St.3d 146, 781 N.E.2d 180, 192; *Gannett*, 571 A.2d at 754–55 (Walsh, J. dissenting); David Weinstein, *Protecting a Juror's Right to Privacy: Constitutional Constraints and Policy Options*, 70 TEMPLE L.REV. 1, 30 (1997). Although this argument is appealing in its simplicity, we

refuse to elevate a single sentence discussing potential limitations on the right of access to *voir dire* proceedings to signify that the United States Supreme Court held that jurors' names and addresses are part and parcel of *voir dire* itself. In the absence of any clearer intent on the part of the High Court, we believe we must examine whether jurors' names and addresses have historically been revealed during *voir dire* and whether revealing such information plays a significant positive role in the criminal trial. These considerations lead us to conclude that the constitutional right of access applies to jurors' names, but not their addresses.

Looking at the earliest juries, there can be no question that jurors' names and addresses were generally known. Jurors were selected from a small group of people, either "the vill" [9] or "the hundred," [10] and were subject to rigorous qualifications. *See* 2 BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 359 (Cooley 4th ed. 1899); *see also Richmond,* 448 U.S. at 568–69, 100 S.Ct. 2814; James B. Thayer, *The Jury and Its Development,* 5 HARV. LAW R. No. 7, 295, 297–98 (1892). The jury was commonly chosen from a select group that was respected in the community—be they knights or landowners—individuals who were clearly known to the public because of their status. BLACKSTONE, at 351; Thayer, at 300 (pointing out that in the grand assize, knights were regularly the jurors). Moreover, during the earliest practices, the jurors were required to know the parties to the action or to have some knowledge of the incident in question. BLACKSTONE, at 359, 374; Thayer, at 297.[11] Indeed, based upon the

---

9. "The vill" or township was the smallest government institution and was made up of a small group of houses that were bound together by communal agriculture. *See* THEODORE PLUCKNETT, A CONCISE HISTORY OF THE COMMON LAW 82–83 (2nd ed. 1936).

10. "The hundred" was an administrative unit referring to either one hundred families or one hundred settlements. PLUCKNETT *supra* n. 9.

11. For further elucidation of this historical practice, Thayer points to counsel's argument in a 1738 case, related to the question of granting a new trial:

> The evidence of one or two witnesses ought not to overturn the finding of *twelve gentlemen of figure and fortune, who might, too, be governed by their own knowledge.*

early history it would be simple to conclude that jurors' names and addresses were public knowledge, since "everybody knew everybody on the jury." *See In re Baltimore Sun Co.,* 841 F.2d 74, 75 (4th Cir.1988); *Gannett,* 571 A.2d at 756 (Walsh, J. dissenting); Jack Pope, *The Jury,* 39 TEX. L.REV. 426, 437 (1960) ("[from] the beginning, jurors had to be freemen, had to own property, had to come from the vicinity of the dispute, and had to give an oath."). Such a limited view of the history of the jury, however, fails to account for its evolution.

From these earliest practices, the jury selection pool was enlarged such that only six, four, and then two jurors needed to be from "the hundred" or "the vill" where the incident occurred. BLACKSTONE, at 360; Thayer, at 298. These requirements were eventually abolished and by 1705 the jury merely needed to come from "the body of the county at large." BLACKSTONE, at 360; Thayer, at 298. We see this evolution in a definition of the jury given in the mid–1800's as "a body of men taken from the community at large, summoned to find the truth of disputed facts." MAXIMUS A. LESSER, THE HISTORICAL DEVELOPMENT OF THE JURY SYSTEM, 3 (William S. Hein & Co. 1992) (1894) (quoting definition of jury from WILLIAM FORSYTH, TRIAL BY JURY (1852)). Similarly, the tradition regarding what knowledge jurors possessed changed. Under the modern practice, jurors were selected only if they did not know the parties and by 1816, it was firmly established that jurors could no longer rely on their own "peculiar knowledge" of the subject in question in reaching the verdict. BLACKSTONE, 352, 363, 370; LESSER, at 121.

While the first American settlers may have followed some of the earlier practices,[12] it is generally acknowledged that the more modern practices came to represent the early American jury. LESSER, at 127–28. For example, in Virginia, the first court matters were heard in Jamestown and the jurors were selected from the vicinage of Jamestown. *See* Harold M.

Thayer, 301 n. 2 (emphasis added).

12. For example, there was some evidence of continuing the tradition of community witnesses in the Plymouth colony by adding Indians to the jury. *See* Thayer, at 307.

Hyman & Catherine M. Tarrant, *Aspects of American Jury Trial History,* in THE JURY SYSTEM IN AMERICA, 23, 26 (Rita James Simon ed., 1975). As the population moved into the interior, the practices needed to change. *Id.* By 1662, the Virginia Legislature passed a requirement that all capital matters be heard before a jury of twelve. *Id.* Six of the jurors were summoned from the locality where the crime had been committed, but the other six needed only to be temporary residents there. *Id.* Thus, even at the beginnings of jury selection practice in the United States, the assumption could no longer be that the impaneled jurors were generally known to the public at large. In America, public knowledge of jurors' identities was further eroded by the mid–19th Century when it was common that the men most likely to be known in the community were exempt from jury service. *See* LESSER, at 182–83 ("The extreme to which the exemption from jury duty is carried—obviating the service of many persons most desirable by virtue of standing, calling or capacity—may be illustrated by reference to the law of New York. . . ."). Thus, to simply conclude that jurors' names and addresses were public knowledge because "everybody knew everybody on the jury"[13] ignores the historical evolution of the jury system.

The historical practice, however, does support a conclusion that jurors' names were generally available to the public, since the practice was to "call" the jury forward. *See* BLACKSTONE, at 357–58; *see also Press–Enterprise I,* 464 U.S. at 507, 104 S.Ct. 819 (noting that the court called the jurors forward, one by one). Furthermore, these historical practices continued in America. *See, e.g., Beacon,* 781 N.E.2d at 193 (noting that in the treason trial of Aaron Burr, the jurors' names were contained in the reported decision); *In re Baltimore Sun Co.,* 841 F.2d 74, 75 (4th Cir.1988). This tradition continues today, as there are many examples of prospective jurors' names being revealed during *voir dire* in capital cases.[14] *See, e.g.,*

13. *See Baltimore, infra* at 902.

14. The fact that jurors were historically "called forward" in open court does not alter our common law analysis, since that analysis is con-

*Commonwealth v. Robinson,* 581 Pa. 154, 864 A.2d 460, 489 (2004) (jurors identified by name); *Commonwealth v. Duffey,* 579 Pa. 186, 855 A.2d 764, 771 (2004) (prospective juror identified by name); *Commonwealth v. Fisher,* 572 Pa. 105, 813 A.2d 761, 772 (2002) (same); *Commonwealth v. Lesko,* 553 Pa. 233, 719 A.2d 217, 221 (1998) (same). Accordingly, our historical survey leads us to conclude that while jurors' names have commonly been disclosed during trial, the evidence supporting disclosure of addresses is circumspect at best.

Having looked at the historical practice surrounding the disclosure of jurors' names and addresses, we will now consider the "logic" prong to determine if there is a significant positive function on criminal matters by revealing jurors' names and addresses. In conducting the "logic" inquiry, we must balance two competing concerns—the value of openness in criminal trials that enhances the fairness and perception of fairness in the criminal justice system versus the need to encourage jury service by the average citizen, which may implicate privacy concerns for those who are asked to serve. With regard to the First Amendment analysis, the United States Supreme Court has explained that how we allocate the right between the accused and the public is not crucial. *Press–Enterprise I,* 464 U.S. at 508, 104 S.Ct. 819. Of course, in conducting the analysis, we cannot ignore the rights of the accused as "no right ranks higher than the right of the accused to a fair trial. But the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the *voir dire* which promotes fairness." *Id.* Accordingly, in considering the logic prong we primarily focus on the right of "everyone" to open proceedings, which enhances public confidence in the judicial system. *Id.*

First, with respect to the value of openness in criminal trials, a trial by jury and public access to criminal trials serve the same function—ensuring the fairness of the judicial process. From the earliest days of this country, it was believed that the jury was the best way to assure a fair trial. *See* THE

cerned with whether there is a document recording such information that is maintained as part of the judicial record of the case.

FEDERALIST NO. 83, at 545 (Alexander Hamilton) (The Modern Library ed.) ("[The jury trial] is a valuable check on corruption"). Likewise, public scrutiny of the criminal justice system enhances the quality and safeguards the integrity of the factfinding process, "with benefits to both the defendant and to society as a whole." *Globe,* 457 U.S. at 606, 102 S.Ct. 2613. Openness also fosters an appearance of fairness, which increases public respect for the criminal justice system as a whole. "And in the broadest terms, public access to criminal trials permits the public to participate in and serves as a check upon the judicial process—an essential component in our structure of self government." *Id.*

While these considerations weigh in favor of disclosing jurors' names and addresses, we believe that revealing impaneled jurors' names is sufficient. Openness is fostered by the public knowledge of who is on the impaneled jury. Armed with such knowledge, the public can confirm the impartiality of the jury, which acts as an additional check upon the prosecutorial and judicial process. *Cf.,* JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW, vol. 6, § 1834 (Chadbourn ed. 1976) (discussing the importance of public trials with regard to witnesses, since access secures the presence of those who may be able to "contradict falsifiers"). Similarly, prospective jurors would be less inclined to lie during *voir dire* "by inducing the fear of exposure of subsequent falsities through disclosure by informed persons who may chance to be present or to hear of the testimony from others present." *Id.* Accordingly, disclosing jurors' names allows the public to participate in the judicial process and furthers the fairness and the appearance of fairness of the criminal trial, since the public can confirm the impartiality of the proceedings and the prospective jurors are more likely to tell the truth. *See Wigmore supra;* Robert Raskopf, *A First Amendment Right of Access to a Jurors' Identity,* 17 PEPP. L.REV. 357, 372 (January 1990).

On the other hand, disclosing jurors' addresses is not a constitutional imperative. Revealing jurors' names is sufficient for the public to determine the identity of the jurors' and

to provide an additional check on ensuring the impartiality of the jury. Disclosure of jurors' addresses does not advance these important functions, but merely makes these functions easier. The First Amendment is not a rule of convenience. Indeed, disclosing jurors' addresses may ultimately hamper the operation of the jury system as a whole.

Turning to the need to encourage jury service, all of the important functions served by the jury are meaningless unless there are twelve qualified citizens willing to serve as jurors. The average citizen has expressed discomfort at the prospect of being harassed by the press during or after the case is over. *See* Weinstein, 70 TEMPLE L.REV. at 30; Nancy King, *Nameless Justice: The Case for Routine Use of Anonymous Juries in Criminal Trials,* 49 VAND. L.REV. 123, n. 127 (1996). Similarly, jurors have expressed fear of physical harm related to serving on criminal juries. *See King supra.* Either of these factors may make the average citizen less willing to serve on a jury, especially if he or she believes that the media, the defendant, or the defendant's family and friends know where he or she lives. It is not difficult to conclude that the privacy concerns of citizens being asked to serve as jurors are real and legitimate.

▮▮▮▮ Taking in mind the tradition of accessibility, as well as the competing values of openness versus the promotion of jury service, the conclusion is inescapable. We believe the First Amendment provides a qualified right of access to jurors' names, but not addresses.[15] In this way, the public will

---

**15.** Appellants' also raise an alternative argument under Article 1, Section 11 of the Pennsylvania Constitution. We have held that the public has a right to observe criminal proceedings under this section. *Fenstermaker supra.* Nevertheless, we have also indicated that Article 1, Section 11, did not provide a greater right of access to the public in criminal trials than the public trial provision of the federal constitution. *Commonwealth v. Hayes,* 489 Pa. 419, 414 A.2d 318, 322 (1980). In fact, Appellant–WPXI asserts that we have held Article 1, Section 11 and the First Amendment to be "co-extensive." *See* Appellant's Brief at 16 n. 9. Because we believe that the federal Constitution only provides the public with a right of access to jurors' names, we see no need to look at this provision further.

be provided with enough information to confirm the identity of jurors when necessary. Disclosing jurors' names furthers the objective of a fair trial to the defendant and gives assurances of fairness to society as a whole. But the average citizens' concern that the media will be camped out on their front lawn and fear of physical harm can be alleviated. We recognize that courts have been split on this issue. *See United States v. Edwards*, 823 F.2d 111 (5th Cir.1987) (finding redaction of jurors' names and addresses during trial did not violate the First Amendment); *Johnson v. United States*, 270 F.2d 721, 724 (9th Cir.1959) (holding that it is not error for the trial judge to refuse to direct the jurors to give exact street address); *Gannett supra* (holding no First Amendment right to jurors' names and addresses); *contra United States v. Antar*, 38 F.3d 1348 (3d Cir.1994); *Beacon supra* (providing for a common law right to jurors' names and addresses); *In re Disclosure of Juror Names and Addresses*, 233 Mich.App. 604, 592 N.W.2d 798 (1999) (holding press had a qualified First Amendment right to access jurors' names and addresses post-verdict); *cf. In re Globe Newspaper Co.*, 920 F.2d 88 (1st Cir.1990) (providing for access to jurors' names and addresses under Massachusetts statute); *United States v. Quattrone*, 402 F.3d 304 (2d Cir.2005) (finding order prohibiting publication of jurors' names and addresses during pendency of trial to be a "prior restraint" in violation of the First Amendment); *Baltimore Sun supra* (finding a common law access to jurors' names and addresses). Nevertheless, we find that experience and logic favor the disclosure of jurors' names, but not addresses.

Last, we must briefly address the qualified nature of the right of access to jurors' names. As discussed previously, the trial court can deny the right of access when it offers on the record findings demonstrating that "closure is essential to

Additionally, there is no need to resolve the Commonwealth's alternative argument implicating Rule 632, since a Rule cannot overcome a constitutional requirement. We merely note, however, that the Rule can be read consistently with our conclusion today, if the confidentiality requirements are construed to relate to the substance of the jurors' responses, rather than to the identifying information contained therein.

64

preserve higher values and is narrowly tailored to serve that interest." *Press–Enterprise II*, 478 U.S. at 13–14, 106 S.Ct. 2735. For example, as alluded to in *Press–Enterprise I*, the court may find that disclosing the jurors' names in a particular circumstance raise concerns for juror safety, jury tampering, or juror harassment. Similarly, a court may be justified in withholding jurors' names for the duration of the case until the case is decided and judgment is rendered. Such closures, however, must be supported by appropriate findings.

Applying this standard to the instant case, the trial court did not meet it. In its post-trial opinion, the court offered that the instant case was a widely publicized and sensationalized event. Clearly, the court was motivated by a concern for the jurors' privacy. For this reason, the court stated that it also concluded that there was a risk that the jurors could be "subject to invasion of privacy and harassment if their names and home addresses were made public." Trial court slip opinion, dated 12/31/2003, at 15. While particularized findings of fact may support such closure in an appropriate case, including concerns when the jurors have been or are likely to be harassed by the public, press, or defendant's family or friends, the reasons given by the trial court in this case, were unsubstantiated. Furthermore, general concerns for harassment or invasion of privacy would exist in almost any criminal trial. Rather, the closure must be supported by specific findings demonstrating that there is a substantial probability that an important right will be prejudiced by publicity and that reasonable alternatives to closure cannot adequately protect the right. *Press–Enterprise II*. The trial court did not make any specific findings in this case. Accordingly, the refusal to disclose the jurors' names was unwarranted.

For the reasons stated herein, we reverse the order of the Superior Court.

Justice BALDWIN did not participate in the consideration or decision of this case.

Former Justice NEWMAN did not participate in the decision of this case.

Justices CASTILLE, SAYLOR, EAKIN and BAER join the opinion.