IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**DAVID M. MORGAN AND TERRI JO NEFF,**
*Petitioners,*

*v.*

**HON. TIMOTHY DICKERSON AND HON. LAURA CARDINAL,**
**JUDGES OF THE SUPERIOR COURT OF THE STATE OF ARIZONA,**
**IN AND FOR THE COUNTY OF COCHISE,**
*Respondent Judges,*

*and*

**THE STATE OF ARIZONA,**
*Real Party in Interest.*

---

No. CV-21-0198-PR
**Filed June 14, 2022**

---

Special Action from the Superior Court in Cochise County
The Honorable Timothy Dickerson
The Honorable Laura Cardinal
Nos. CR201700516, CR201800156

**AFFIRMED**

---

Opinion of the Court of Appeals, Division Two
252 Ariz. 14 (App. 2021)

**VACATED IN PART**

---

COUNSEL:

Evan Stele (argued), Sergey Harutyunyants, Rule 39(c) Certified Law Students, Jacob M. Karr, Gregg P. Leslie, Rule 39(c) Supervising Attorneys, First Amendment Clinic, Public Interest Law Firm, Sandra Day O'Connor College of Law, Phoenix, Attorneys for David Morgan

Mark Brnovich, Arizona Attorney General, Marjorie S. Becklund (argued), Assistant Attorney General, Tucson, Attorneys for Respondent Judges Dickerson and Cardinal

Brian M. McIntyre, Cochise County Attorney, Michael A. Powell (argued), Deputy County Attorney, Bisbee, Attorneys for State of Arizona

Roopali H. Desai, Andrew T. Fox, Coppersmith Brockelman PLC, Phoenix, Attorneys for Amicus Curiae The Reporters Committee for Freedom of the Press

Mark Brnovich, Arizona Attorney General, Jeffrey Sparks, Acting Chief Counsel, Capital Litigation Section, Ginger Jarvis, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General

———————————

VICE CHIEF JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL and JUSTICES LOPEZ, BEENE, MONTGOMERY, and KING joined. JUSTICE BOLICK concurred.

———————————

VICE CHIEF JUSTICE TIMMER, opinion of the Court:

¶1         The superior court in Cochise County uses "innominate juries" for all criminal jury trials. Under that procedure, prospective and impaneled jurors are referred to by numbers rather than by names throughout open-court proceedings, although the court and the parties know their identities. Consequently, although voir dire examinations and trials are open for public viewing, observers are not provided jurors' names absent order of the court.

¶2          The issue here is whether the First Amendment to the United
States Constitution prohibits the court's routine use of innominate juries.
Specifically, we are asked to decide whether the First Amendment provides
the public a qualified right of access to jurors' names during voir dire,
thereby creating presumptive access to those names that can be overcome
only on a case-by-case basis by showing both a compelling state interest
and that denying access is a remedy narrowly tailored to serve that interest.
We hold the First Amendment does not prohibit the court's practice.

**BACKGROUND**

¶3          This matter arises from two criminal cases that used
innominate juries without objection by either party.   In each case,
journalist David M. Morgan intervened and unsuccessfully sought access
to prospective and impaneled jurors' names before and after trial.[1]   On
special action review, the court of appeals consolidated the cases and
upheld the rulings.   *Morgan v. Dickerson*, 252 Ariz. 14, 15–16 ¶ 1
(App. 2021).   In doing so, the court rejected Morgan's arguments that the
Cochise County Superior Court's innominate jury system is not authorized
under Arizona law and violates the First Amendment.   *See id.* at 17 ¶ 9, 18
¶¶ 12–13.

¶4          Morgan sought review of the court of appeals' opinion but
only as it concerns the First Amendment challenge.   We accepted review
because the constitutionality of the innominate jury system is a recurring
issue of statewide importance.

**DISCUSSION**

**I.**

¶5          Arizona law provides that "[t]he list of juror names or other
juror information shall not be released unless specifically required by law
or ordered by the court."   A.R.S. § 21-312(A); *see also* Ariz. R. Sup. Ct.
123(e)(10) (stating that juror-identifying information obtained in juror
questionnaires or during voir dire is confidential "unless disclosed in open

_____

[1] Terri Jo Neff, another journalist, joined Morgan in requesting access to the
jurors' names.   Although Neff participated in the proceedings below, she
did not join Morgan's petition for review filed in this Court.

court or otherwise opened by order of the court"); Ariz. R. Crim. P. 23.3(b) (requiring the court to refrain from naming jurors when polling the jury "to ensure the jurors' privacy"). Nevertheless, Morgan argues the First Amendment provides a qualified right of public access to jurors' names during voir dire, which creates a presumption of access that can be overcome only if a compelling state interest exists in a particular case to shield the names, and denying access is a narrowly tailored remedy to serve that interest. Consequently, he asserts the superior court's presumptive use of innominate juries in all cases violates the First Amendment.

¶6        It is worth noting that despite strained efforts to view his First Amendment argument as consistent with § 21-312(A), Morgan effectively challenges that statute's facial validity. If the First Amendment right attaches, it creates a presumption for access that can be overcome only by a compelling interest in secrecy. Section 21-312(A) creates an inverse presumption—prohibiting disclosure unless affirmatively required by law or court order. These presumptions cannot coexist. If Morgan is correct, application of § 21-312(A) would violate the First Amendment in every circumstance, making it facially unconstitutional. *See State v. Wein*, 244 Ariz. 22, 31 ¶ 34 (2018) (stating that a statute is facially unconstitutional if "no set of circumstances exists under which the [statute] would be valid" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987))). As the challenging party, Morgan "bears the 'heavy burden' of demonstrating that the restriction [in § 21-312(A)] is facially unconstitutional." *See id.* at 26 ¶ 10 (quoting *Salerno*, 481 U.S. at 745).

¶7        We review whether the First Amendment guarantees the press and public a qualified right of access to jurors' names during voir dire de novo as an issue of constitutional law. *See Fann v. State*, 251 Ariz. 425, 432 ¶ 17 (2021).

## II.

### A.

¶8        The First Amendment, as applied to Arizona through the Fourteenth Amendment, prohibits the state from "abridging the freedom of speech, or of the press." U.S. Const. amend. I. It does not explicitly guarantee the press or public access to a criminal trial. *Cf.* U.S. Const. amend. VI ("In all criminal prosecutions, *the accused* shall enjoy the right to a speedy and public trial." (emphasis added)); *Gannett Co. v. DePasquale*, 443

U.S. 368, 379–80 (1979) (holding the Sixth Amendment public trial guarantee is personal to the accused). But because the First Amendment "was enacted against the backdrop of the long history of trials being presumptively open," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980) (plurality opinion), to "enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system," *Press-Enter. Co. v. Superior Court* (*Press-Enterprise I*), 464 U.S. 501, 508 (1984), and the explicit guarantees of free speech and a free press necessitate the ability to gather information by observing proceedings, the First Amendment implicitly guarantees the press and public a coextensive right to attend criminal trials, *Richmond Newspapers*, 448 U.S. at 575–77, 580; *see also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982) ("And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government.").

¶9     The access right guaranteed by the First Amendment is not absolute, but qualified. *See Globe Newspaper*, 457 U.S. at 606–07. Criminal trials are presumptively open to the public, and the court can close the proceedings only if the state shows a compelling state interest for doing so and that closure is a remedy narrowly tailored to serve that interest. *See id.*

¶10     The Supreme Court has identified two complementary considerations for deciding whether the First Amendment affords the public a qualified right to access criminal proceedings through attendance or by obtaining transcriptions of those proceedings. *Press-Enter. Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1, 8, 13 (1986). First, courts should ask "whether the place and process have historically been open to the press and general public" (the experience inquiry). *Id.* at 8. Second, courts should ask "whether public access plays a significant positive role in the functioning of the particular process in question" (the logic inquiry). *Id.* If both inquiries yield affirmative answers, the right attaches. *See id.* at 9; *see also Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989). Applying these considerations, the Court has held that the First Amendment guarantee of qualified public access attaches to criminal trials, *see Richmond Newspapers*, 448 U.S. at 580, voir dire examinations, *see Press-Enterprise I*, 464 U.S. at 508–10, and trial-like preliminary hearings, *see Press-Enterprise II*, 478 U.S. at 13.

¶11     Morgan conflates the right to attend voir dire with a right to access juror names. They are far from the same thing. Here, the public

was not barred from attending any part of the criminal trials, including voir dire, so the most essential press and public right is not implicated. But the Supreme Court has not addressed whether the First Amendment guarantee of qualified public access to voir dire examinations extends to learning jurors' names. Regardless, Morgan argues that failing to disclose jurors' names essentially bars the public from attending part of the voir dire examinations. Consequently, he asserts we should apply the experience and logic inquiries to determine whether the First Amendment guarantees the public a qualified right of access to those names.

¶12 The experience and logic inquiries are an imperfect fit. They were designed to determine whether criminal proceedings should be open for public attendance and scrutiny, not whether the public has a presumptive right to information concerning criminal proceedings that is not announced in open court. *See Press-Enterprise II*, 478 U.S. at 8. Notably, jurors' names are neither a "place" nor a "process," the focal points for the experience and logic inquiries. Also, use of the inquiries risk conflict with the accepted principle that the First Amendment does not guarantee "a right of access to all sources of information within government control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 9, 14 (1978) ("The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act."); *see also United States v. Blagojevich*, 612 F.3d 558, 563 (7th Cir. 2010) (reflecting uncertainty about "whether we should treat the judge's decision [to refer to impaneled jurors by number] as a partial closure of voir dire covered by *Press-Enterprise I* or as a right-of-access situation more like *KQED*"); *In re Boston Herald, Inc.*, 321 F.3d 174, 183 (1st Cir. 2003) (noting courts have rejected First Amendment right-of-access claims to discovery materials, withdrawn plea agreements, search warrant affidavits, and presentence reports).

¶13 Despite the incongruity of the test here, we will apply the experience and logic inquiries to determine whether announcing jurors' names forms an integral part of voir dire examinations, thereby giving the public a qualified constitutional right to learn those names. *See Press-Enterprise I*, 464 U.S. at 505–10. Other courts have applied these inquiries in deciding whether the First Amendment guarantees a qualified right of access to jurors' names, and the parties offer no other analytical paradigm. *See, e.g.*, *Commonwealth v. Long*, 922 A.2d 892, 901 (Pa. 2007); *Gannett Co. v. State*, 571 A.2d 735, 736–37 (Del. 1989).

6

## B.

### 1. Experience

¶14 The experience inquiry focuses on whether the "place or process" has been open historically throughout the country rather than in particular states or localities. *See El Vocero de Puerto Rico* (*Caribbean Int'l News Corp.*) *v. Puerto Rico*, 508 U.S. 147, 150–51 (1993). The Supreme Court has drawn from multiple sources to pinpoint historical practice, including English and American commentators on the common law existing when the Constitution was adopted and ratified, then-existing state authorities, and modern statutes reflecting the public's understanding of historical practices. *See Gannett*, 571 A.2d at 743–44 (collecting cases).

¶15 We are spared the task of combing history to decide whether the voir dire examination process was traditionally open to the public. The Court in *Press-Enterprise I* concluded that historically, "the process of selection of jurors has presumptively been a public process." 464 U.S. at 505–08. Our inquiry, then, focuses on whether revealing jurors' names was traditionally part of those public proceedings.

¶16 Many courts and commentators have probed history and concluded that jurors' names were traditionally revealed during jury selection proceedings. *See, e.g.*, *United States v. Wecht*, 537 F.3d 222, 235–37 (3d Cir. 2008) (reviewing cases, statutes, and commentary before concluding "it appears that public knowledge of jurors' names is a well-established part of American judicial tradition"); *Long*, 922 A.2d at 901–03 (conducting similar survey and concluding "jurors' names have commonly been disclosed during trial"); David Weinstein, *Protecting a Juror's Right to Privacy: Constitutional Constraints and Policy Options*, 70 Temp. L. Rev. 1, 30 (1997) ("The names of jurors have been available to the public throughout the history of the common law."). We need not re-plow this ground and thus accept it.

¶17 Courts have reached opposing conclusions regarding whether this history merits an affirmative answer to the experience inquiry. Most courts have concluded it does. *See, e.g.*, *Wecht*, 537 F.3d at 237 ("[T]he 'experience' prong . . . favors a conclusion that jurors' names have traditionally been available to the public prior to the beginning of trial."); *Long*, 922 A.2d at 902–03 (to same effect); *State ex rel. Beacon J. Publ'g Co. v. Bond*, 781 N.E.2d 180, 193 ¶ 42 (Ohio 2002) (to same effect). A minority of

courts have reached the opposite conclusion. The Delaware Supreme Court's decision in *Gannett* exemplifies the minority reasoning. Although recognizing the history of revealing jurors' names during voir dire, the *Gannett* Court disagreed that the nation has "any historical tradition of constitutional dimension regarding public access to jurors' names" and instead concluded this tradition simply "gives trial courts discretion over such matters." *Gannett*, 571 A.2d at 748; *see also United States v. Black*, 483 F. Supp. 2d 618, 624–26 (N.D. Ill. 2007).

**¶18** Although the minority position is well taken, we find the majority position more persuasive. The Supreme Court has focused on whether courts historically permitted access to proceedings without discussing whether those proceedings were conducted as a matter of discretion or directive. *See Press-Enterprise II*, 478 U.S. at 8 (explaining courts should consider "whether the place and process have historically been open" because "a 'tradition of accessibility implies the favorable judgment of experiences'" (quoting *Globe Newspaper*, 457 U.S. at 605)). *But see In re Reps. Comm. for Freedom of the Press*, 773 F.2d 1325, 1332 (D.C. Cir. 1985) ("The further requirement that the historical practice play 'an essential role' in the proper functioning of government is also needed, since otherwise the most trivial and unimportant historical practices—for example, the courts' earlier practice of reading their judgments aloud in open session—would be chiselled in constitutional stone."). Tradition is the driving force behind this inquiry, not the authority underpinning that tradition. Whether access to jurors' names was discretionary with courts, and thus considered nonessential to public observation of voir dire, bears on whether access "play[ed] a significant positive role in the functioning of [voir dire]," which is the subject of the logic inquiry. *See Press-Enterprise II*, 478 U.S. at 8. We answer the experience inquiry by concluding that courts have historically revealed jurors' names during voir dire proceedings.

## 2. Logic

**¶19** By asking whether access to jurors' names "plays a *significant* positive role in the functioning of the particular process in question," the logic inquiry sets an exacting standard. *See id.* (emphasis added). A minimally positive role falls short. Morgan argues the standard is met here because public access to jurors' names carries the same benefits as accessing voir dire proceedings and trials. The State counters that accessing jurors' names would not significantly add to the proper

functioning of voir dire, and disclosure would expose jurors to the risk of danger and embarrassment.

**¶20**         *Press-Enterprise I*'s reasoning for holding that open voir dire examinations play a significant positive role in that process guides our answer to the logic inquiry.   The Court observed that the public right to attend voir dire promotes fairness and the appearance of fairness, critical to public confidence in the criminal justice system.   *Press-Enterprise I*, 464 U.S. at 508.   Specifically, "[t]he value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known."   *Id.*   Open proceedings also have a "community therapeutic value" by providing an outlet for public reaction to criminal acts.   *Id.* at 508–09 (quoting *Richmond Newspapers*, 448 U.S. at 570).   "[P]ublic proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected."   *Id.* at 509.   In short, open proceedings play a significant positive role in voir dire by checking the courts to ensure established standards are being used to select jurors and by simultaneously assuring the public that fairly selected jurors are holding offenders to account for their crimes.   *See id.* at 508–09; *see also Press-Enterprise II*, 478 U.S. at 9.

**¶21**         Morgan has failed to show that public access to jurors' *names* likewise plays a significant positive role in voir dire.   With or without such access, the press and the public can attend voir dire proceedings and were able to do so in these cases.   Anyone can sit in the courtroom during a criminal trial and observe the juror screening process, including voir dire examinations.   They can also observe for-cause challenges and peremptory strikes, hear the judge's rulings, and mark any deviation from standards put in place by the legislature or this Court to select a fair jury.[2] *See* A.R.S. §§ 21-301 to -336 (providing jury pool formation procedures); Ariz. R. Crim. P. 18.2–18.6 (outlining jury selection procedures).   The public is also generally entitled to access public records reflecting how jury pools are formed in the superior court.   *See* A.R.S. § 39-121.01(D) (establishing public records request procedures); Ariz. R. Sup. Ct. 123 (setting forth presumptive open record policy for court records and

[2] Effective January 1, 2022, Arizona no longer permits peremptory strikes of jurors.   *See* Ariz. Sup. Ct. Order No. R-21-0020.

establishing access procedures). Accessing jurors' names would not significantly add to the public's ability to assure itself that voir dire is fairly conducted or to check the courts in disregarding established standards for jury selection.

¶22 Other courts have reached the opposite conclusion, reasoning that public knowledge of jurors' names would deter prospective jurors from misrepresenting their answers during voir dire, permit public investigation of the accuracy of those answers, and assure the public that prospective jurors are drawn from a fair cross-section of the community. *See, e.g.*, *Long*, 922 A.2d at 903–04. We disagree.

¶23 First, the public's role in voir dire is as an observer, not as a participant charged with selecting a fair jury. *See Press-Enterprise I*, 464 U.S. at 508 (describing the value of openness in terms of observation). The judge and the parties are charged with that responsibility. *See DePasquale*, 443 U.S. at 383 ("In an adversary system of criminal justice, the public interest in the administration of justice is protected by the participants in the litigation."). They are provided prospective jurors' names and are highly motivated to safeguard the integrity of the process, ensure the jury pool is drawn from a fair cross-section of the community, and unearth any information demonstrating juror bias. *See Gannett*, 571 A.2d at 750 ("The courts, the State and the defendant have concurrent paramount concerns for, and obligations to assure, a fair trial."); Ariz. R. Crim. P. 18.4 (authorizing parties to challenge both the entire jury panel on the ground it was not properly selected and the seating of individual jurors if a reasonable ground exists to believe the juror cannot render a fair and impartial verdict).

¶24 Second, we are unconvinced that providing open access to jurors' names would cause prospective jurors to be more forthcoming during voir dire. *See Gannett*, 571 A.2d at 750 (refusing to adopt the "cynical view" that jurors would not respond truthfully unless the press has access to jurors' names). It is just as likely that such access would motivate them to be less than forthcoming to avoid public embarrassment about very sensitive matters, like disabilities, medications, and past experiences as crime victims. *See Black*, 483 F. Supp. 2d at 628 (stating that public access to jurors' names during trial "enhances the risk that the jury will [not be] able to function as it should, in secrecy and free of any outside influence" (emphasis omitted)). And in this internet age, where jurors' names can trigger lightning-fast access to a wealth of biographical

information, including addresses, any slightly positive role in divulging jurors' names to the public is outweighed by the risk to jury integrity.

¶25        In sum, public access to jurors' names promotes neither fairness in voir dire proceedings nor the perception of fairness.   As such, it does not play a significant positive role in the functioning of voir dire, and we answer the logic inquiry in the negative.   Consequently, the First Amendment does not provide the press or public with a qualified right to access jurors' names, and § 21-312(A) is facially valid.   The Cochise County Superior Court therefore did not err by presumptively using innominate juries.

¶26        The court has discretion to order access to jurors' names.   *See* § 21-312(A); Ariz. R. Sup. Ct. 123(e)(10).   The standards for exercising that discretion are not before us today.   We note, however, that when a court denies a request for access, a best practice would be to explain its reasoning on the record.   Finally, prospective and seated jurors are naturally free to take the initiative and publicly reveal their own names.

**CONCLUSION**

¶27        For these reasons, we affirm the trial courts' orders. Although we agree with the court of appeals' conclusion, we vacate ¶¶ 10–21 of its opinion to replace that court's reasoning with our own.

BOLICK, J., concurring:

¶28        I agree entirely with the Court's analysis.   I write only to add that the statute protecting juror names survives even the most demanding First Amendment compelling-interest standard.   Unlike most states, Arizona's constitution contains an express privacy protection, providing in relevant part that "[n]o person shall be disturbed in his private affairs . . . without authority of law."   Ariz. Const. art. 2, § 8.   Whatever the scope of that right, *see State v. Mixton*, 250 Ariz. 282 (2021), the State plainly has a compelling interest in enforcing it to protect juror privacy.   *See, e.g.*, *Simpson v. Miller*, 241 Ariz. 341, 345 ¶ 9 (2017) (constitutional provisions reflect "state interests of the highest order"); *cf. State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 601 ¶ 53 (2017) (agreeing with the proposition that a right protected by the state constitution is "a subject of state concern"); *id.* at 607 ¶ 83 (Bolick, J., concurring in part and in the result) (stating that a state constitutional right "necessarily elevates the subject matter to statewide concern").   For this reason, in addition to the reasons set forth in the main opinion, I concur.